# Illinois Official Reports

## Supreme Court

---

### *People v. Kimble*, 2019 IL 122830

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. DAVID KIMBLE, Appellee. |
| Docket No. | 122830 |
| Filed | April 18, 2019 |
| Decision Under Review | Appeal from the Appellate Court for the Second District; heard in that court on appeal from the Circuit Court of McHenry County, the Hon. Sharon L. Prather, Judge, presiding. |
| Judgment | Appellate court judgment reversed. <br> Circuit court judgment affirmed. <br> Cause remanded. |
| Counsel on Appeal | Lisa Madigan, Attorney General, of Springfield (David L. Franklin, Solicitor General, and Michael M. Glick and Michael L. Cebula, Assistant Attorneys General, of Chicago, of counsel), for the People. <br><br> James E. Chadd, State Appellate Defender, Thomas A. Lilien, Deputy Defender, and Josette Skelnik, Assistant Deputy Defender, of the Office of the State Appellate Defender, of Elgin, for appellee. |

Justices          JUSTICE THEIS delivered the judgment of the court, with opinion.

Chief Justice Karmeier and Justices Thomas, Kilbride, and Garman concurred in the judgment and opinion.

Justice Burke dissented, with opinion.

Justice Neville dissented, with opinion, joined by Justice Burke.

## OPINION

¶ 1    In this appeal, we are asked to consider whether defendant David Kimble's motion to bar his reprosecution on double jeopardy grounds was properly denied where the trial judge had determined the jury was deadlocked and declared a mistrial. The appellate court held that double jeopardy principles barred a retrial because defendant did not consent or acquiesce to a mistrial and there was no manifest necessity for a mistrial. 2017 IL App (2d) 160087, ¶¶ 28, 56. For the following reasons, we reverse the judgment of the appellate court.

¶ 2    BACKGROUND

¶ 3    In 2014, a McHenry County grand jury indicted defendant and charged him with four counts of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1) (West 2012)) against S.M., a nine-year-old girl. The indictment charged that defendant, who was then 45 years old, touched S.M.'s vagina through her clothing on four separate occasions between August and November 2013.

¶ 4    A jury trial commenced in November 2015. After opening statements by both parties, the State presented its evidence over a two-day period. On the first day of trial, the jury heard witness testimony, including the testimony of S.M., and viewed a videotaped interview with S.M. On the second day of trial, the jury heard a continuation of one witness's testimony and viewed a videotaped interview with defendant. The State then rested its case. Defendant made a motion for a directed verdict, which the court denied, and then rested after entering a stipulation.

¶ 5    The evidence revealed that S.M. lived in Wonder Lake, Illinois, with her father, Jeff; her three siblings; her father's girlfriend, Jen; and Jen's two children. For a period of time, they lived next door to defendant, and then defendant moved a couple of streets away from them. Defendant would babysit the children, and sometimes they would spend the night at his home. He bought gifts for S.M., including clothing and a bike that stayed at defendant's house. Jeff worked for defendant for a period of time, and they had a good relationship.

¶ 6    Jen had a conversation one evening with her daughter, B.L., which prompted Jen to ask S.M. if anybody had ever touched her inappropriately. At first, S.M. did not answer. When Jen asked if defendant had ever touched her inappropriately, S.M. said yes. She told Jen that, every time she asked defendant to stop, he would stop but, the next time, he would forget and touch her again. Jen spoke to Jeff about these conversations, and they agreed to call the principal of the elementary school. At that point, Jeff decided to end his employment with defendant.

¶ 7    The school principal, Anne Huff, testified that she had a conversation with both children. B.L. alluded to defendant "snuggling" with her. When Huff asked S.M. who babysat her, S.M.

named defendant. Huff then asked S.M. if she felt safe with defendant. S.M. replied, "not when he touches me down there," pointing to her vagina. When asked how many times defendant touched her there, S.M. replied five times. When asked whether there were any other times she did not feel safe, S.M. said she did not like to wake defendant because he would get angry.

¶ 8 Detective Misty Marinier testified that she had been a detective with the Village of Algonquin for four years. She had specific training and experience in investigating child sexual abuse cases, including 40 hours of forensic interview training. She had previously conducted about 20 to 25 of these types of interviews. In December 2013, using the protocol she was taught in her training, Marinier conducted a 34-minute recorded video interview with S.M. at the Child Advocacy Center. The jury viewed the video recording.

¶ 9 In the interview, S.M. told Marinier that defendant touched her on her "privates" and pointed to the vagina on a diagram depicting the female anatomy. S.M. told her that the touching happened about two to five times in defendant's bedroom and that her clothes were "usually" on. The other children were at defendant's home during these incidents but were usually in the living room. S.M. did not indicate that she was held down or grabbed at any point or that defendant pulled down her pants. S.M. told Marinier that she was scared to talk about the touching, but nobody had told her not to talk about it. Based on her training and experience, Marinier stated that incremental disclosures are normal after children are interviewed because they are more comfortable knowing the information is already "out there" and that they are not going to get into trouble.

¶ 10 S. M., who was 11 years old at the time of trial, testified that defendant touched her on her vagina in his bedroom. She described an incident when she was getting some coloring materials that defendant bought her that were in defendant's bedroom. S.M. testified that defendant came in, pushed her onto his bed, took off her clothes, and rubbed her in her "bad spot" with his hands. S.M. testified that she told defendant to stop but he did not stop. She stated that the inappropriate touching happened about 10 times under similar circumstances. Defendant would close and lock the bedroom door. S.M. did not recall the first or last time something like that had happened. She told Jen about it, then her dad, then the principal at her school, and spoke with the detective at the Child Advocacy Center. S.M. stated that she was not really comfortable talking to the detective and was uncomfortable talking about it at trial.

¶ 11 Jen's daughter, B.L., who was nine years old at the time of trial, testified that she knew "David Kimble" as her uncle, and that she knew "Dave" as a man "who kind of like works." When asked if "Dave" knew anyone in her family, she responded, "[h]e knows [S.M.]—mostly knows everybody." B.L. did not see "Dave" in the courtroom. The last time she saw him was two years ago. She used to sleep over at his house, either in his bed or on the floor. When asked whether anything ever happened at her Uncle Dave's house that made her uncomfortable, she testified that he sometimes rubbed his hand on her upper thigh up and down when she was on the bed and he was on the floor on his knees. The way he touched her made her uncomfortable. The day after "Dave" did that, she told her mom.

¶ 12 After B.L.'s testimony, the trial court denied defense counsel's motion for a mistrial, in which counsel argued that B.L.'s testimony was inadmissible under the relevant evidentiary standard for evidence of propensity. A limiting instruction in that regard was provided to the jury.

¶ 13      Detective Michelle Asplund began her testimony at the end of the first day of trial and continued on the second day of trial. She testified that she had been employed as a detective since 2006 and had been investigating crimes against children since 2010. Asplund and her partner interviewed defendant on December 11, 2013. The interview was videotaped. Asplund used her interview and interrogation course training techniques during the questioning. A 3½-hour redacted version of the interview was played for the jury. Defendant repeatedly denied any inappropriate touching.

¶ 14      After the State rested, the trial court denied a second motion for a mistrial based on the detective interjecting that defendant had asked for a lawyer during the interview. The court had immediately sustained the objection and instructed the jury to disregard the detective's answer. The court also denied defendant's motion for a directed verdict.

¶ 15      Defendant rested after presenting the following stipulation. If called as a witness, Kelly Gallagher would testify that she is a victim witness coordinator with the McHenry County State's Attorney's office. On October 30, 2015, she was present for a conversation between Assistant State's Attorneys (ASAs) Eisenstein and Gibbons and S.M. in the State's Attorney's office. S.M. stated that she was touched approximately 10 times by defendant over the clothes. When asked if she was ever touched under the clothes, she said no. The ASAs asked S.M. whether defendant held her down, and she said yes. She was then asked if she had her clothes on or off when he would hold her down. She said both. The ASAs asked S.M. what defendant would do when he held her down. She said he would use one hand to hold her down and the other to touch her private part. When asked what defendant would do when he held her down without her clothes on, she said that he would touch her. When asked why she initially said she was touched over the clothes, she said she was embarrassed and did not want to talk about it. The stipulation reiterated that S.M. was embarrassed when interviewed earlier by Detective Marinier and did not want to talk about it.

¶ 16      On the third day of trial, closing arguments were made, and jury instructions were read. The jury began deliberating at 10:50 a.m. About 2½ hours later, at their request, the jury returned to the courtroom to rewatch the videotaped interview of S.M. The jury then continued its deliberations at 2:15 p.m.

¶ 17      About two hours later, at 4:25 p.m., the trial judge indicated on the record that she had received a note from the jury as follows: "After deliberating for five hours, and despite our best efforts, we are at an impasse." The note was signed by the foreperson. Counsel was present for both parties. The trial judge indicated that this was the second time that she had received information from the jury that they were at an impasse. She explained that the jury had also informed the bailiff that they were at an impasse shortly after viewing the video. The trial judge informed the parties that she had instructed the bailiff to tell the jurors to continue to deliberate.

¶ 18      The trial judge then suggested bringing the jurors into the courtroom to ask whether they thought further deliberations would be helpful. She stated, "I would be more than willing to ask them if they'd like to go home, come back tomorrow, sleep on it. If it would do any good, I'll bring them back tomorrow."

¶ 19      The State was concerned about getting multiple responses and inquired whether the court wanted to send a note to the jury. The trial judge stated that she would speak with the foreperson. Defendant had no objection to proceeding in that manner. The trial judge also

granted the State's request to address the court outside the presence of the jury before the court made any decisions.

¶ 20 Thereafter, the following colloquy was had in open court in the presence of the jury:

"THE COURT: [Foreperson], I received your note that you are at an impasse. Can you tell me how long that you have been at that impasse?

THE FOREPERSON: Pretty much a good part of the day. Four and a half hours or five hours.

THE COURT: And nothing has changed during that period of time?

THE FOREPERSON: Some numbers changed here and there, but we were stuck at a certain proportion.

THE COURT: And how long has that existed?

THE FOREPERSON: About I would say three hours.

THE COURT: And you haven't moved during that period of time?

THE FOREPERSON: No, ma'am.

THE COURT: Do you—let me ask, do you think if I sent you home for the night, let you sleep on it, would it do any good? Could you continue your deliberation tomorrow? Would that help at all?

THE FOREPERSON: I asked that question, and it was indicated that it would not.

THE COURT: It would not?

THE FOREPERSON: No, ma'am."

¶ 21 The following discussion was then had outside the presence of the jury:

"MR. GIBBONS [(ASSISTANT STATE'S ATTORNEY)]: Judge, I do understand the foreperson's comments. I understand it seems as though they are completely deadlocked at this point and it might be futile for future further deliberation. However, I believe that procedurally, from the State's point of view, we should at least attempt the Prim instruction[1] before we discharge the jury.

MR. HAIDUK [(DEFENSE ATTORNEY)]: I would agree with the State, your Honor.

THE COURT: Pardon?

MR. HAIDUK: I would agree with the State.

THE COURT: You agree with the State?

MR. HAIDUK: I do. Or I guess, in the alternative, my argument would be we—despite them saying it won't make a difference, come back tomorrow. I think those are really the only two viable alternatives.

MR. GIBBONS: We could always read them the Prim instruction and bring them back tomorrow.

THE COURT: Mr. Haiduk?

MR. HAIDUK: I don't have any objection to that, Judge.

---

[1]The "Prim instruction" refers to a supplemental jury instruction set out in *People v. Prim*, 53 Ill. 2d 62, 75-76 (1972).

MR. GIBBONS: Just suggestions, Judge. I'm not saying that's the right method that we believe, but—

THE COURT: I am fearful, folks, if I do that, you're going to have some extremely angry jurors.

MR. GIBBONS: I understand, Judge.

THE COURT: There has been some very loud voices back there for a period of time. I think it would be futile to do that. Therefore, I would decline.

MR. GIBBONS: Understood, Judge."

¶ 22 At that point, the jurors were called back into the courtroom. The court then indicated that it would excuse the jurors and thanked them for their service. After discharging the jurors, the court declared a mistrial.

¶ 23 The State announced its intention to retry defendant. Defense counsel asked for a status date to allow for time to issue some subpoenas. When asked by the court if it had any objection to the date chosen for status and to reset for trial, the State responded that it had none. The court then notified the parties that the matter was continued for status and to reset for trial.

¶ 24 Thereafter, defendant filed a motion to bar further prosecution based on double jeopardy principles, arguing that there had been no manifest necessity to declare a mistrial. At the hearing, defendant stood on his motion without argument. The court ruled that the double jeopardy clause did not bar defendant's retrial.

¶ 25 The appellate court reversed. The court found that (1) defendant did not consent to or acquiesce in the trial court's declaration of a mistrial, (2) the trial court's decision to declare a mistrial resulted from an act of judicial indiscretion, and (3) there was no manifest necessity for the mistrial. 2017 IL App (2d) 160087, ¶¶ 28, 41, 56. We allowed the State's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. July 1, 2017).

¶ 26                                                    ANALYSIS
¶ 27                            Double Jeopardy Following a Mistrial
¶ 28 The double jeopardy clause of the fifth amendment, which applies to the states through the fourteenth amendment, provides that an accused may not be tried more than once for the same offense. U.S. Const., amend. V; *Currier v. Virginia*, 585 U.S. ___, ___, 138 S. Ct. 2144, 2149 (2018). We interpret our state's double jeopardy provision identically to the federal provision. See Ill. Const. 1970, art. I, § 10; *People v. Levin*, 157 Ill. 2d 138, 159 (1993). The clause unequivocally provides three separate protections, barring retrial for the same offense after an acquittal, retrial after a conviction, and multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969); *Levin*, 157 Ill. 2d at 144.

¶ 29 Moreover, because jeopardy attaches when the jury has been impaneled and sworn, the constitutional provision also protects a defendant's " 'valued right to have his trial completed by a particular tribunal' " and to be spared from the burden of repeated proceedings, even where the trial does not finally resolve the merits of the charges. *Arizona v. Washington*, 434 U.S. 497, 503-04 (1978) (quoting *United States v. Jorn*, 400 U.S. 470, 484 (1971)).

¶ 30 The Supreme Court, however, long ago explained that principles of double jeopardy do not bar reprosecution after discharge of a jury on the grounds that the jury cannot reach a verdict. The Court explained that the trial judge may declare a mistrial "whenever, in their opinion,

- 6 -

taking all the circumstances into consideration, there is a manifest necessity for the [mistrial], or the ends of public justice would otherwise be defeated." *United States v. Perez*, 22 U.S. 579, 580 (1824); see also *People v. DeFrates*, 395 Ill. 439, 446 (1946).

¶ 31 The rule has been continuously reaffirmed because "a mechanical rule prohibiting retrial whenever circumstances compel the discharge of a jury without the defendant's consent would be too high a price to pay for the added assurance of personal security and freedom from governmental harassment which such a mechanical rule would provide." *Jorn*, 400 U.S. at 480. Thus, a defendant's right to a complete trial with a chosen jury " 'must in some circumstances be subordinated to the public's interest in fair trials designed to end in just judgments.' " *Id.* (quoting *Wade v. Hunter*, 336 U.S. 684, 689 (1949)).

¶ 32 Accordingly, when a mistrial has been declared, a retrial may proceed without offending double jeopardy principles if (1) the defendant consents to the mistrial or (2) there is a manifest necessity for the mistrial. *Washington*, 434 U.S. at 505; *People ex rel. Roberts v. Orenic*, 88 Ill. 2d 502, 508 (1981). Under these circumstances, the second trial is properly understood as the continuation of the original jeopardy arising from the first trial. *Richardson v. United States*, 468 U.S. 317, 325 (1984).

¶ 33 Manifest Necessity Due to Deadlocked Jury

¶ 34 In the case before us, the basis for defendant's motion to bar retrial and the trial court's denial of that motion both centered on whether the trial court exercised sound discretion in declaring a mistrial based on a manifest necessity. Accordingly, we begin our analysis with that issue.

¶ 35 The manifest necessity standard does not require that a mistrial be "necessary" in the strict sense of the word, but it does require a "high degree" of necessity. See *Washington*, 434 U.S. at 506. Settled law provides that a jury's inability to reach a unanimous verdict is one circumstance that constitutes a manifest necessity permitting a retrial. Indeed, a deadlocked jury is the classic example of a situation when the manifest necessity standard is satisfied. *Renico v. Lett*, 559 U.S. 766, 774 (2010); see also *Sattazahn v. Pennsylvania*, 537 U.S. 101, 121 (2003) (Ginsburg, J., dissenting, joined by Stevens, Souter, and Breyer, JJ.) (a hung jury meets the "manifest necessity" standard); *Richardson*, 468 U.S. at 324 ("[W]e have constantly adhered to the rule that a retrial following a 'hung jury' does not violate the Double Jeopardy Clause."); *Oregon v. Kennedy*, 456 U.S. 667, 672 (1982) (a hung jury is the "prototypical example" that meets the "manifest necessity" standard); *Washington*, 434 U.S. at 509 ("the mistrial premised upon the trial judge's belief that the jury is unable to reach a verdict [has been] long considered the classic basis for a proper mistrial"); *People v. Bean*, 64 Ill. 2d 123, 128 (1976) (reprosecution not barred where a trial court discharges a jury because of a failure to reach a verdict, absent abuse of discretion).

¶ 36 A trial judge's "decision to declare a mistrial when he considers the jury deadlocked is *** accorded great deference by a reviewing court." *Washington*, 434 U.S. at 510; see also *Lett*, 559 U.S. at 774 ("The decision whether to grant a mistrial is reserved to the 'broad discretion' of the trial judge ***."). While a trial judge may not act "irrationally or irresponsibly" in declaring a mistrial, the declaration will be upheld so long as it is the result of the trial judge's exercise of "sound discretion." *Washington*, 434 U.S. at 510, 514; *Bean*, 64 Ill. 2d at 128

- 7 -

("Courts are to exercise a sound discretion on the subject and it is impossible to define all the circumstances which would render it proper to interfere.").

¶ 37    The reasons for granting a trial judge broad discretion are " 'especially compelling' " in cases involving a potentially deadlocked jury. *Lett*, 559 U.S. at 774 (quoting *Washington*, 434 U.S. at 509). The rationale is that " 'the trial court is in the best position to assess all the factors which must be considered in making a necessarily discretionary determination whether the jury will be able to reach a just verdict if it continues to deliberate.' " *Id.* (quoting *Washington*, 434 U.S. at 510 n.28). Otherwise, trial judges might apply coercive means to break an apparent deadlock, creating a " 'significant risk that a verdict may result from pressures inherent in the situation rather than the considered judgment of all the jurors.' " *Id.* (quoting *Washington*, 434 U.S. at 509). Based on this highly deferential standard, the Supreme Court in *Lett* noted that it had never overruled a trial court's declaration of a mistrial based on a jury's inability to reach a verdict on the ground that the manifest necessity standard had not been met. *Id.* at 775.

¶ 38    The Supreme Court has emphasized that a manifest necessity ruling must be grounded in its own facts. The Court has "expressly declined to require the 'mechanical application' of any 'rigid formula' when trial judges decide whether jury deadlock warrants a mistrial." *Id.* (quoting *Wade*, 336 U.S. at 690-91). In reviewing whether the trial court acted within its discretion in declaring a mistrial on the basis of a jury deadlock, lower courts have considered several nonexhaustive factors as useful guideposts. These factors include (1) statements from the jury that it cannot agree, (2) the length of the deliberations, (3) the length of the trial, (4) the complexity of the issues, (5) the jury's communications to the judge, and (6) the potentially prejudicial impact of continued forced deliberations. *United States v. Vaiseta*, 333 F.3d 815, 818 (7th Cir. 2003); *United States v. Byrski*, 854 F.2d 955, 961 (7th Cir. 1988). A trial court's failure to explicitly find manifest necessity or to articulate on the record all of the reasons for a mistrial in the case of jury deadlock does not render the ruling that the jury was deadlocked constitutionally defective, as long as the record supports an adequate justification for the trial court's ruling. *Washington*, 434 U.S. at 516-17.

¶ 39    The jury's own statement that it is unable to reach a verdict has been repeatedly considered the most important factor in determining whether a trial court abused its discretion in declaring a mistrial. See, *e.g.*, *Lett*, 559 U.S. at 778; *United States v. Hernandez-Guardado*, 228 F.3d 1017, 1029 (9th Cir. 2000); *Escobar v. O'Leary*, 943 F.2d 711, 718 (7th Cir. 1991). Here, the record revealed two statements from the jury indicating its inability to agree on the verdict. The trial judge initially urged the jurors to continue to deliberate and subsequently took care to clarify where the jury stood with respect to the deliberative process. The trial judge specifically asked the foreperson whether additional time would be helpful.

¶ 40    The jury emphatically indicated that it had been at an impasse for several hours, and the collective belief of the jurors, after the foreperson specifically inquired of them, was that it would be futile to continue to deliberate. The statements from the jury and the unequivocal communication with the foreperson supported the trial judge's determination that further deliberations would have been futile.

¶ 41    Contrary to defendant's assertions, the record reflects that this was not a long and highly complicated case. Rather, it was a relatively short trial, which primarily involved two days of witness testimony and videotaped statements and one defendant. The charges arose out of essentially the same operative conduct. At its core, the case was a credibility assessment

between S.M. and defendant. Although defendant disputes the amount of time the jury deliberated, the record reflects that the jury deliberated for at least several hours and rewatched the video of S.M. The trial judge gave the parties an opportunity to provide input and to comment on the foreperson's remarks, and she considered their input prior to declaring a mistrial.

¶ 42   Additionally, the trial judge explained on the record her fear of coercing the jury into a decision by requiring further deliberations. She expressed concern about the potential for "extremely angry jurors" after hearing "very loud voices [in the jury room] for a period of time." We will not substitute our judgment in characterizing the state of mind of the jurors. Under these circumstances, applying the relevant considerations, the record amply supports that it was not irrational, irresponsible, or otherwise unreasonable for the trial judge to conclude that the jury was unable to reach a verdict and that further deliberations would have been pointless and coercive.

¶ 43   In reaching our conclusion, we reject defendant's assertion, raised for the first time on appeal, that the trial judge's declaration of the mistrial was a result of judicial indiscretion, rather than manifest necessity. Defendant maintains that the trial judge triggered the need to declare a mistrial by engaging in the *ex parte* communication, directing the jury to continue deliberating. He argues that the trial judge used the *ex parte* communication as the basis for her later decision to declare a mistrial, instead of giving the *Prim* instruction or allowing further deliberation. Neither the record nor the controlling law supports a finding that the trial judge's initial communication prompted a mistrial.

¶ 44   Initially, we reiterate that any communication from a judge to a jury, after the jury has begun deliberations, should be made in open court and in the presence of the parties. *People v. Childs*, 159 Ill. 2d 217, 227 (1994). Nevertheless, we have explained that a nonprejudicial *ex parte* communication does not impact the fairness of a defendant's trial. *People v. Johnson*, 238 Ill. 2d 478, 489 (2010). Here, the substance of the court's communication to the jury in this case to "continue deliberating" was proper, constituting a clear and noncoercive response well within the court's discretion. See *id.* Furthermore, we note that defendant never objected to the *ex parte* communication itself nor raised it as a basis for granting his motion to bar reprosecution. See *People v. McLaurin*, 235 Ill. 2d 478, 488 (2009) ("Failure to raise claims of error before the trial court denies the court the opportunity to correct the error ***.").

¶ 45   Essentially, defendant argues that the trial court was responsible for the continued impasse by failing to give the jury the *Prim* instruction to provide it with further guidance. Contrary to defendant's assertion, the trial judge was not obligated to give the *Prim* instruction at any time prior to declaring a mistrial. Nothing in our case law or the constitution indicates that the *Prim* instruction is mandatory, even on request of the parties, much less a prerequisite for finding a manifest necessity exists to declare a mistrial. Nor was the trial judge obligated to force the jury to deliberate for a minimum period. See *Blueford v. Arkansas*, 566 U.S. 599, 609 (2012) ("We have never required a trial court, before declaring a mistrial because of a hung jury, to consider any particular means of breaking the impasse ***."); *Lett*, 559 U.S. at 775 (a trial judge is not constitutionally obligated, before declaring a mistrial based on jury deadlock, to require the jury to deliberate for a minimum period of time or to issue a supplemental jury instruction); *People v. Cowan*, 105 Ill. 2d 324, 328 (1985) (no obligation to give the *Prim* instruction).

¶ 46    It is within the trial court's discretion whether to give that charge at any time during the proceedings, and the trial judge was in the best position to decide whether such an instruction would be helpful or, instead, coercive, leading the jury toward a verdict it otherwise would not have reached. *Escobar*, 943 F.2d at 718. We will not second-guess the trial court or substitute our judgment for the trial judge's judgment or reweigh the evidence. A discretionary decision implies a range of acceptable outcomes. *United States v. Taylor*, 569 F.3d 742, 747 (7th Cir. 2009).

¶ 47    Defendant's argument rests on mere speculation as to what the record would have shown if defense counsel had voiced a desire for a *Prim* instruction after the first jury impasse and whether the trial judge would have even agreed, in her discretion, to give that instruction at that point. This speculation cannot constitute a basis for relief under double jeopardy principles. Rather, defendant's logic would instead merely lead to a "mechanical application" of a "rigid formula" for dealing with these situations—exactly what the Supreme Court has expressly declined to require. *Lett*, 559 U.S. at 775. Defendant's argument also fails to recognize all of the other factors, as we discussed, that support the deliberate exercise of the trial court's discretion in declaring a mistrial.

¶ 48    Lastly, the cases cited by defendant and relied on by the appellate court are completely inapposite. First, those cases do not involve a trial court's determination whether a mistrial is warranted due to jury deadlock, which, as explained, requires a case by case analysis and a high degree of deference. Rather, *Jorn* involved a trial judge who abruptly *sua sponte* ordered a mistrial, after concluding that the government's witnesses did not understand the extent to which they could incriminate themselves, even after the witnesses indicated they understood their rights. The parties had no opportunity to suggest a continuance or to object to the jury discharge. Under these circumstances, the Court held that reprosecution was barred because the judge made no effort to exercise sound discretion to ensure that there was a manifest necessity for the mistrial. *Jorn*, 400 U.S. at 487.

¶ 49    In *People v. Wiley*, 71 Ill. App. 3d 641, 643 (1979), the "judicial indiscretion," as claimed by the State, was that the trial court denied its request for a continuance and abruptly dismissed the case to penalize the State for its failure to comply with an earlier order directing that the remaining witnesses be available to testify. There is no indication on this record that the trial judge declared a mistrial based on any judicial indiscretion.

¶ 50    In light of our disposition, we need not consider the State's alternate arguments that defendant expressly or impliedly consented to the declaration of the mistrial.

¶ 51                                                    CONCLUSION

¶ 52    In sum, we discern no basis to conclude that the trial judge abused her considerable discretion in deciding that a mistrial was justified by manifest necessity. Therefore, the double jeopardy clause did not bar reprosecution. Defendant may be retried, and the judgment of the appellate court is reversed.

¶ 53    Appellate court judgment reversed.

¶ 54    Circuit court judgment affirmed.

¶ 55    Cause remanded.

- 10 -

¶ 56    JUSTICE BURKE, dissenting:

¶ 57    Defendant filed a motion to bar retrial based on double jeopardy principles. The circuit court denied the motion. The appellate court reversed, finding, in part, the trial judge's *ex parte* communication with the jury led to the declaration of a mistrial. Thus, it was the trial judge's judicial indiscretion, not manifest necessity, that prompted the mistrial. The majority reverses the appellate court. I cannot agree.

¶ 58    As the appellate court aptly notes:

"Jury deliberations are a critical stage of trial, involving substantial rights that trigger a defendant's right to be present and participate in person and by counsel. [Citation.] Communications between the judge and the jury after the jury has retired to deliberate, except when held in open court and in the defendant's presence, deprive the defendant of his or her fundamental rights. [Citation.]" *People v. Kimble*, 2017 IL App (2d) 160087, ¶ 36.

¶ 59    The majority finds the *ex parte* communication was nonprejudicial and was "proper, constituting a clear and noncoercive response well within the court's discretion," citing *People v. Johnson*, 238 Ill. 2d 478, 489 (2010). *Supra* ¶ 44. For the reasons set forth in detail in my dissent in *Johnson*, I believe the trial judge's *ex parte* communication was prejudicial and that defendant suffered a deprivation of his fundamental rights. Because of this prejudicial communication, the declaration of a mistrial was the result of judicial indiscretion, not due to manifest necessity.

¶ 60    For these reasons, I would find that reprosecution of defendant is barred by the principles of double jeopardy.


¶ 61    JUSTICE NEVILLE, dissenting:

¶ 62    The trial judge *sua sponte* declared a mistrial after the jury announced it was deadlocked. Defense counsel subsequently filed a motion to bar reprosecution based on double jeopardy principles. Defense counsel argued that in light of the fact that both he and the prosecutor requested that the trial judge give a *Prim* instruction (see *People v. Prim*, 53 Ill. 2d 62, 75-76 (1972)) and suggested that the judge order the jury to continue deliberating, there was no justification for declaring a mistrial. The trial judge disagreed and denied the motion, finding there was "manifest necessity" to declare the mistrial based on jury deadlock.

¶ 63    The appellate court reversed. The appellate court found that "[w]ithout the earlier *ex parte* communication, the court could not reasonably have believed that giving the *Prim* instruction would be futile." 2017 IL App (2d) 160087, ¶ 37. The appellate court determined that the "judge's *ex parte* communication thus might have contributed to the jury's lack of progress and later did unduly influence her denial of the joint request for the *Prim* instruction." *Id.* ¶ 41. Consequently, the appellate court held that "the court's judicial indiscretion, rather than a manifest necessity, prompted the mistrial," and that "[u]nder these circumstances, reprosecution is barred." *Id.*

¶ 64    The majority reverses the appellate court. The majority concludes, in part, that no prejudice resulted from the trial judge's *ex parte* communications with the jury, where the judge responded to the jury's announcement that it was at an impasse, by having the bailiff tell the jury to "continue deliberating." The majority finds the trial judge's response was proper, noncoercive, and well within the court's discretion.

¶ 65	I am unable to join the majority's holding that double jeopardy does not apply in this case. I believe a trial judge's *ex parte* communication with a deliberating jury is a *per se* violation of a defendant's right to a fair trial and right to be present at all critical stages of the trial, and therefore, I would affirm the appellate court.

¶ 66	Both the United States and Illinois Constitutions afford criminal defendants the right to be present in court with the assistance of counsel at all critical stages of a trial. *People v. Lindsey*, 201 Ill. 2d 45, 55 (2002); *People v. Nielson*, 187 Ill. 2d 271, 293 (1999). Jury deliberations are a critical stage of trial. *People v. Kliner*, 185 Ill. 2d 81, 162 (1998).

¶ 67	Accordingly, it is well settled that once a jury retires to deliberate, it is improper for the trial judge to engage in any communications with the jury, except in open court and in the presence of the accused and his counsel. *People v. Childs*, 159 Ill. 2d 217, 227 (1994). "For most of this State's history, our court consistently recognized that 'it is [reversible] error *** for a trial judge to hold any communication with the jury after their retirement to deliberate upon their verdict, except in open court.' " *Id.* at 235 (Harrison, J., concurring) (quoting *People v. Beck*, 305 Ill. 593, 596 (1922)).

¶ 68	One of the reasons our court adhered to this long-standing rule is because it wisely recognized that, if a trial judge was permitted to communicate with jurors outside the presence of defendant, the defendant would have no direct knowledge of what was said and done and would be at a disadvantage in proving prejudice or that something improper occurred. *Id.* The defendant's knowledge of the *ex parte* communication would always be secondhand and, therefore, based on speculation and conjecture. *Id.* at 236.

¶ 69	The instant facts illustrate this point. After the bailiff informed the trial judge that the jury was at an impasse, rather than notify defendant and his counsel of this development, the judge sent an *ex parte* message to jurors, through the bailiff, instructing them to continue deliberating. I believe that the defendant's due process rights were violated by the trial judge's *ex parte* communication, transmitted by the bailiff, to a jury that had announced it was at an impasse and was seeking guidance on how to proceed.

¶ 70	The record does not indicate whether the trial judge's *ex parte* communication to the jury was in writing or was orally communicated by the bailiff. It is axiomatic that third-party oral communications are prone to inadvertent inaccuracies as well as embellishment.

¶ 71	Moreover, owing to the nature of oral communication, even if a defendant or his counsel witnessed and heard such communication, it would be extremely difficult if not impossible to reconstruct the subtle nuances as to how the communication was conveyed to jurors. As Justice Bristow noted in his dissenting opinion in *People v. Tilley*, 411 Ill. 473, 486-87 (1952) (Bristow, J., dissenting, joined by Maxwell, J.):

> "The remarks of the judge may be ever so harmless and innocuous but his manner might be indicative of something—a facial distortion, a smile, a frown, a grimace—might conceivably indicate approval, disappointment or contempt which might adversely affect defendant's cause. A litigant would face great difficulty in showing such facts in proving their influence upon the jury. It surely is against the policy of a law of this State to impose upon a defendant in a criminal proceeding such a burden."

¶ 72	I believe that when a trial judge or the judge's agent (clerk, bailiff, sheriff, etc.) engages in an *ex parte* communication with jurors, while the jury is deliberating, the communication violates a defendant's right to a fair trial and right to be present at all critical stages of the trial.

Our court has determined that jury deliberations are a critical stage of a trial (*Kliner*, 185 Ill. 2d at 162), and the United States Supreme Court has determined that "a trial is unfair if the accused is denied counsel at a critical stage of his trial" (*United States v. Cronic*, 466 U.S. 648, 659 (1984)).

¶ 73 More importantly, I believe that a trial judge's *ex parte* communication with jurors, after the jury has retired to deliberate upon its verdict, constitutes a structural error in the jury-deliberation phase of a criminal trial, rendering verdicts resulting from such deliberations unreliable. A structural error is an error that renders a criminal trial fundamentally unfair or unreliable in determining guilt or innocence. *People v. Averett*, 237 Ill. 2d 1, 12-13 (2010). The United States Supreme Court has held that when a constitutional error has "consequences that are necessarily unquantifiable and indeterminate" it qualifies as a "structural error." (Internal quotation marks omitted.) *United States v. Gonzalez-Lopez*, 548 U.S. 140, 150 (2006).

¶ 74 In this case, when the jury first announced it was at an impasse, the trial judge failed to inform defendant or his counsel of this development, thereby preventing defendant or his counsel from having the opportunity to make a motion for a *Prim* instruction. When the jury announced for a second time that it was at an impasse, only the trial judge was aware of the jury's earlier problems in reaching a verdict. On appeal, it is impossible to determine, without speculating, the effect of the trial judge's *ex parte* indiscretion on this jury.

¶ 75 I believe that the trial judge's *ex parte* communication indiscretion with the deliberating jury had unquantifiable and indeterminate consequences, qualifying the *ex parte* indiscretion as a structural error. Because structural errors undermine the integrity of the judicial process, cases infected with such errors must be reversed and are not subject to harmless-error review. *People v. Thompson*, 238 Ill. 2d 598, 608-09 (2010). Accordingly, because the trial judge engaged in an *ex parte* communication with the jury and *sua sponte* terminated the jury's deliberations, I would find that reprosecution of defendant is barred by double-jeopardy principles and affirm the judgment of the appellate court.

¶ 76 JUSTICE BURKE joins in this dissent.