2022 IL App (2d) 210316
No. 2-21-0316
Opinion filed October 26, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 19-CF-799 |
| JEFFREY D. RICHARDSON, | ) ) ) | Honorable Donald M. Tegeler, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE BRENNAN delivered the judgment of the court, with opinion.
Justices Hudson and Birkett concurred in the judgment and opinion.

**OPINION**

¶ 1    On May 1, 2019, a hooded man robbed a Citgo gas station in Elgin at gunpoint. Seven
minutes later, police arrested defendant, Jeffrey D. Richardson, a short distance away and near a
large quantity of cash found in a bush. At defendant's trial for armed robbery with a firearm (720
ILCS 5/18-2(a)(2) (West 2018)), the State introduced evidence that a police canine followed a
scent trail leading from the Citgo to a bush where police discovered a jacket and a baseball cap
containing DNA; defense counsel did not object. Nearby, police also recovered a phone taken from
the Citgo. A State's expert testified that the DNA on the cap matched defendant's DNA. The
following day, however, the trial court ruled that the requisite foundation for the DNA testimony
was lacking and instructed the jury to disregard it.

¶ 2     The jury deliberated for nearly 10 hours, twice sending the trial court inquiries pertaining to the scent trail evidence. Subsequently, the court gave the jury a *Prim* instruction (see *People v. Prim*, 53 Ill. 2d 62, 75-76 (1972)). Defendant thereafter moved for a mistrial twice, arguing that the jury would be unable to reach a verdict; the trial court denied both motions. The jury found defendant guilty of armed robbery with a firearm, and the trial court sentenced defendant to 25 years' imprisonment. Defendant filed a posttrial motion for a new trial, arguing that (1) the trial court failed to adequately admonish potential jurors regarding the *Zehr* principles, (2) the State failed to prove defendant guilty beyond a reasonable doubt, and (3) the trial court erred by not permitting defendant to argue for a mistrial based on the introduction of subsequently stricken DNA testimony. The trial court denied the posttrial motion.

¶ 3     Defendant raises several alleged errors on appeal: (1) the trial court abused its discretion when it declined to grant a mistrial after striking DNA testimony that had already been presented, (2) the court committed plain error when it declined to grant a mistrial when, during deliberations, the jury was given a *Prim* instruction and then said it could not reach a unanimous agreement, (3) defense counsel rendered ineffective assistance at trial by, *inter alia*, failing to object to improper dog-tracking testimony, and (4) the court undercalculated the amount of presentence custody credit defendant is due. For the reasons that follow, we conclude that the trial court abused its discretion when it declined to grant a mistrial during jury deliberations and that this was structural error. Thus, we reverse and remand for further proceedings.

¶ 4                                    I. BACKGROUND

¶ 5     In May 2019, defendant was charged with armed robbery with a firearm (720 ILCS 5/18-2(a)(2) (West 2018)) and armed violence with a Category I weapon (*id.* § 33A-2(a)). A jury trial took place in March 2021.

¶ 6                                    A. Jury Trial

¶ 7     During its opening argument, the State made reference to DNA recovered from a baseball cap that matched defendant's DNA. Specifically, the prosecutor said the evidence would show that police recovered two items hidden in a bush: a jacket matching the one worn by the robber and a baseball cap.

> "And Mr. Kahn was later shown that jacket. And he said, yes, he is a hundred percent sure that is the jacket that the robber, the defendant, was wearing.
>
> Now, stuffed in that bush as well with the jacket was a baseball type of cap. You will hear there was some DNA testing done on all these items. But DNA sometimes can be recovered, and sometimes it can't.
>
> DNA was recovered from the baseball cap that was stuffed in the bush along with the jacket, and the defendant's DNA was on that baseball cap."

The State thus suggested at the beginning of the trial that DNA evidence would be significant to its case.

¶ 8     The State's first witness, Rashid Kahn, the store clerk, testified about the robbery. Shortly after 9 p.m. on May 1, 2019, a man entered the store and showed Kahn a gun. He stood approximately 3½ feet away. The man wore a black or gray jacket with brown color on the side and a hood pulled tightly around his face, though Kahn was able to "[s]lightly" see his face. He also wore gloves and "was completely black." Kahn could see the man's eyes "and a little bit on the face," but could not observe other facial features such as facial hair or eyebrows. Kahn was "mostly concerned about the gun" and "thinking mostly of the gun." The man demanded that Kahn give him the cash in the register; Kahn complied. The man had a high-pitched voice. He also took the store's phone. He ordered Kahn to lie down on the floor and then left, heading south.

¶ 9    A short time later, police brought Kahn to a police vehicle in which a suspect was sitting and they had the suspect step out of the vehicle so Kahn could observe him. Kahn was 80% sure the suspect was the man who robbed him. Police also showed Kahn a jacket and a phone they recovered. Kahn identified the phone as the one taken from the store and the jacket as the one worn by the perpetrator.

¶ 10    On cross-examination, Kahn acknowledged that he did not view the perpetrator from the front during the robbery. He acknowledged that he did not keep his eyes on the perpetrator the entire time because he was focused on the gun. He also said police "told me that we are going to take you to the person who robbed your store." Police did not show Kahn a photo array. Kahn did not testify as to the quantity of money stolen.

¶ 11    Officer Michael McCarthy testified next. On May 1, 2019, a little after 9 p.m., he and another officer, Officer Root, drove to the Citgo in response to a radio dispatch for a panic alarm. The officers began canvassing the area and reached the area of 222 South Jane Drive, approximately 0.4 miles from the Citgo. They crept along the street and searched using Root's personal flashlight; their car was dark and unmarked. There, McCarthy saw a subject and the officers accelerated in the individual's direction. The individual took off running toward the rear of 222 South Jane Drive. McCarthy lost sight of the subject but then saw him sitting on the back patio of the residence at that address and made contact. That man was defendant.

¶ 12    McCarthy took defendant into custody. Approximately seven minutes had elapsed from the alarm to defendant's arrest. Defendant was sweating. Beside the patio, McCarthy found a large clump of money. The State introduced a screenshot from McCarthy's bodycam depicting defendant at the time of his arrest. He wore a hooded jacket that was gray on bottom and black on top, and he had a mustache and a goatee.

¶ 13    On cross-examination, McCarthy agreed that defendant had a goatee and mustache at the time of his arrest. Defendant was respectful toward him. McCarthy denied that defendant had a high-pitched voice. McCarthy patted down defendant; he may have had a lighter in his pocket. Officers continued to canvass the area but McCarthy could not recall finding anything else of significance.

¶ 14    Officer Ryan Nelis testified next. He spoke to Kahn at the Citgo for approximately 15 minutes, told Kahn that police had located a suspect, and asked Kahn if he would be willing to see if he could make an identification. He then transported Kahn to the scene of defendant's arrest for a "show-up." From a distance of approximately 15 to 20 yards, Nelis had Kahn observe defendant while officers shone a spotlight on him. Kahn indicated that he was 80% sure defendant was the perpetrator, he recognized the face due to its skinniness, and he "maybe" recognized the jacket defendant was wearing.

¶ 15    On cross-examination, Nelis acknowledged that defendant was in handcuffs when Kahn identified him at the show-up. Further, Nelis was not aware of any officer conducting a photo array with Kahn.

¶ 16    Officer Justin Brown testified next. Brown, an officer in the canine unit, arrived at the Citgo shortly after the robbery. His dog was trained to track where a suspect had been by detecting crushed vegetation and skin rafts that fall off human skin. The dog would search for the freshest human odor. Brown and his dog traveled south along Jane Drive. Approximately 100 feet from the intersection of Alison Drive and Jane Drive, on the northwest corner, Brown found a gray plastic phone on the sidewalk. Brown left the phone and radioed for someone to stay by the phone until it could be processed.

¶ 17    Brown continued south until he reached 100 Jane Drive. There, his dog sniffed some bushes and started to dig on a gray jacket located in the bush, indicating that it had recently been contaminated with human odor. As with the phone, Brown radioed for someone to stay with the jacket until it could be processed. He did not locate any other items.

¶ 18    On redirect, Brown indicated that, after his dog begins tracking, "[w]e are locked on to one track." On recross-examination, Brown agreed that, at some point, he discontinued the track because of contamination.

¶ 19    Officer Michael Blomberg testified next. Blomberg collected physical evidence discovered during the investigation, including the gray phone from the Citgo; the jacket, as well as a black cap, hidden in the bushes at 100 Jane Drive; and cash totaling $1240 hidden in the bushes at 222 Jane Drive.[1] Blomberg also lifted several fingerprints from the Citgo, to be sent to the Illinois State Police (ISP) crime lab; collected samples from the phone, black cap, and jacket discovered by Brown for DNA testing; and swabbed defendant's cheek for DNA.

¶ 20    Carolyn Brackett testified next. She was living with her husband at 222 South Jane Drive on May 1, 2019. Shortly after 9 p.m. that night, she heard a loud noise on her rear deck. She looked outside and saw a man she did not recognize at the corner of the deck near a bush where the money was found. Police arrived soon after. Brackett and her husband had not kept or placed any money in their bushes.

¶ 21    The trial court broke for lunch after Brackett's testimony. After returning, the court informed the parties that a juror had made the following inquiry: "Can we get clarity with regards to the DNA test[?] The statement was made that swabs were taken. *** [D]id the DNA match between the evidence, jacket, cap, and Mr. Richardson[?] *** I heard only swabs were taken but

[1]222 Jane Drive is south of 100 Jane Drive, which is south of the Citgo.

no results. Stated that there were a match." In response, the court admonished the jury not to begin deliberating or discussing the case with each other, because the trial was ongoing. Neither party objected to this procedure.

¶ 22    Patricia Hughes, Officer David Rodriguez, and Detective Matthew Vartanian each testified about a handgun discovered in a bush in front of Hughes's home at 49 South Jane Drive on March 25, 2020. Collectively, these witnesses established that Hughes was not aware of the presence of the gun until she found it and that the gun was an operable firearm, though it was weathered and rusty when discovered and required the application of gun oil to function.

¶ 23    Alexander Viana, a latent-fingerprint examiner with the ISP, testified next. Viana received an envelope from the Elgin Police Department containing four latent-fingerprint lifts, examined the same, and determined that none of the latent prints was suitable for comparison.

¶ 24    Dexter McElhiney, a forensic scientist with the ISP, testified next. An issue regarding the integrity of the evidence arose during McElhiney's testimony; nevertheless, he described his methods and conclusions. In relevant part, he explained his conclusion that the sample from the black cap contained defendant's DNA: there was a 1 in 200 octillion chance ("An octillion is 27 zeros") that the DNA sample came from somebody other than defendant. McElhiney elaborated, "So this would be a billion earth populations and multiply that by 20 and then take that number and multiply it by a billion."

¶ 25    Detective Chuck Westerman was the State's final witness. He had interviewed defendant, and a recording of the interview was played for the jury. Defendant said he ran from police because of an outstanding arrest warrant. He had not been at a gas station on the day of the robbery. Further, he had been walking around since 2 p.m., following a fight between his girlfriend and his sister.

¶ 26    The next day, the trial court and the parties conferred to discuss the DNA evidence about which McElhiney testified. The State recalled Blomberg to explain how he collected, stored, and secured the evidence. Outside the presence of the jury, the court then heard arguments as to whether the evidence was admissible. Stating that it was not convinced that the sample obtained from the black cap was properly tested, the court ruled that evidence inadmissible. At the same time, before counsel offered an argument, the court immediately denied defendant's request for a mistrial. When the jury returned, the court gave an admonishment regarding the DNA evidence, stating in part:

> "You may have heard testimony concerning DNA in relation to the baseball cap. You are to disregard any and all testimony you heard.
>
> Any testimony in relation to [the cap] are to be disregarded by the jury. You are not to consider any of the testimony you heard in relation to that or any match that was made when deliberating. You are not allowed to use it."

¶ 27                              B. Jury Deliberations

¶ 28    The jury retired for deliberations at 12:42 p.m. following closing arguments. At 1:53 p.m., the jury sent the trial court four questions:

> "Question number one, where did the path of the dog start?
>
> Question number two, did the dog sniff Mr. Richardson?
>
> Question number three, did the dog sniff the Citgo station?
>
> Question number four, did the dog sniff Mr. Richardson first then the dog started tracking?"

Subsequently, at 4:38 p.m., the jury requested a transcript of Officer Brown's testimony.

¶ 29    At 6:42 p.m., the jury sent a note to the trial court asking, "In the jury process what is the next step if there is not complete (100%) agreement on the verdict?" The court noted that the jury was considering approximately five hours of testimony, consulted with the parties, and issued a *Prim* instruction.

> "The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous. It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement if you can do so without violence to individual judgment. Each of you must decide the case for yourself but do so only after an impartial consideration of the evidence with your fellow jurors.

> In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict. You are not partisans. You are judges, judges of the facts. Your sole interest is to ascertain the truth from the evidence in this case."

At 7:35 p.m., the jury sent another note to the trial court, stating:

> "We have voted a total of four times, three times prior to just recently coming up and once after being down here again. The vote has never been unanimous. The last two votes have not changed in the tallies. We have all come to an agreement that a unanimous decision cannot be decided."

The court noted that, at that point, the jury had been deliberating for seven hours. It then gave the parties several options: "I can obviously declare it hung without asking questions. I can bring them

up and find out what the division is without asking them which way the division is. Or I can tell them they are stuck here until they're done and they can continue." The State requested the court instruct the jury to continue deliberating, while defendant requested a mistrial.

¶ 30    The trial court inquired as to the vote division; the jury, without revealing which way it leaned, indicated it was split 10 to 2. At around 8 p.m., defense counsel again requested a mistrial, highlighting that the jury had voted five times without reaching unanimity. The court told defendant it would not declare a mistrial, to which defense counsel responded, "Defense would accept."

¶ 31    At 8:30 p.m., the trial court again summoned the jury and asked the foreman whether the jury could reach a unanimous verdict that evening. The foreman indicated that the jury had already taken one more vote and answered, "With no time limit, it's possible. ***. I don't know what time—when this ends." The court excused the jury to continue deliberations.

¶ 32    Defendant again asked for a mistrial, but the trial court declined to declare one, stating, "If I don't hear anything, we'll reconvene at 9:30 and see what happens." The jury returned a verdict at approximately 10 p.m., finding defendant guilty of armed robbery with a firearm.

¶ 33    After receiving the verdict, defendant filed a motion for a new trial, which the trial court denied. The court sentenced defendant to 10 years' imprisonment, plus 15 years as a firearm enhancement, for a total of 25 years' imprisonment. It also awarded defendant 69 days' credit for participation in rehabilitation programs.

¶ 34    Defendant timely appealed.

¶ 35                                    II. ANALYSIS

¶ 36    Defendant raises several arguments on appeal. First, the trial court abused its discretion when it denied defendant's motion for a mistrial after the jury heard testimony that defendant's

DNA was found on the cap recovered from the bush near the Citgo and, the following day, that testimony was stricken. Second, the trial court committed plain error when it declined to grant a mistrial when, during deliberations, the jury indicated it could not reach a unanimous decision. Third, defense counsel rendered ineffective assistance at trial by, *inter alia*, failing to object to improper dog-tracking testimony. Fourth, the court undercalculated the amount of presentence custody credit defendant is due.

¶ 37     We agree that the trial court erred when it denied defendant's motion for a mistrial during the course of jury deliberations. The State argues that defendant forfeited this claim by failing to include it in a posttrial motion and contends that defendant cannot demonstrate plain error. We conclude that the trial court committed plain error. Under the second prong of the plain error rule, we conclude that the trial court committed structural error by failing to declare a mistrial after being told by the jury that it could not reach a unanimous verdict.

¶ 38     Defendant first acknowledges that his trial counsel failed to include this issue in a posttrial motion, thus forfeiting the issue. Nevertheless, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). A reviewing court may review an unpreserved error that is clear or obvious when (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error" or (2) "that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 39     The first step is to determine whether error occurred. *Id.* The State emphasizes that the jury continued to deliberate, despite its indications that it could not reach unanimity, and that there is

no evidence in the record of hostility or rancor among the jury, nor of juror coercion. Accordingly, the State argues that the trial court's denial of defendant's motion for a mistrial was not an abuse of discretion.

¶ 40 Trial judges are given broad discretion to grant mistrials so as to reduce the coercive pressure on juries to break apparent deadlock. See *People v. Kimble*, 2019 IL 122830, ¶ 37. Our supreme court has cited, at minimum, six relevant factors in reviewing whether a trial court has acted within its discretion in deciding whether to declare a mistrial on the basis of a jury deadlock: "(1) statements from the jury that it cannot agree, (2) the length of the deliberations, (3) the length of the trial, (4) the complexity of the issues, (5) the jury's communications to the judge, and (6) the potentially prejudicial impact of continued forced deliberations." *Id.* ¶¶ 38-42 (holding trial court did not abuse its discretion by declaring mistrial where juror statements supported determination that further deliberations would have been futile). "The jury's own statement that it is unable to reach a verdict has been repeatedly considered the most important factor in determining whether a trial court abused its discretion in declaring a mistrial." *Id.* ¶ 39. A jury impasse is more significant when the case is short and less complicated. *Id.* ¶ 41 (noting the "relatively short trial, which primarily involved two days of witness testimony and videotaped statements and one defendant" and the uncomplicated nature of the case. "At its core, the case was a credibility assessment between [the victim] and [the] defendant.").

¶ 41 We conclude that the trial court abused its discretion when it failed to grant defendant's motion for a mistrial after the court read the jury the *Prim* instruction and the jury subsequently indicated it could not agree. After approximately six hours of deliberation, at 6:42 p.m., the jury sent the trial court a note, asking, "In the jury process what is the next step if there is not complete (100%) agreement on the verdict?" The court responded by giving a *Prim* instruction:

"The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous. It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement if you can do so without violence to individual judgment. Each of you must decide the case for yourself but do so only after an impartial consideration of the evidence with your fellow jurors.

In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict. You are not partisans. You are judges, judges of the facts. Your sole interest is to ascertain the truth from the evidence in this case."

Then, at 7:35 p.m., the jury sent another note to the trial court, stating:

"We have voted a total of four times, three times prior to just recently coming up and once after being down here again. The vote has never been unanimous. The last two votes have not changed in the tallies. *We have all come to an agreement that a unanimous decision cannot be decided*." (Emphasis added).

Defense counsel again moved for a mistrial, which the trial court denied.

¶ 42    Three of the *Kimble* factors support a conclusion that the trial court abused its discretion when it failed to grant defendant's motion for a mistrial when the jury indicated it could not agree after having been provided the *Prim* instruction. First, and most importantly, the jury unequivocally stated that it could not agree: "We have all come to an agreement that a unanimous decision cannot be decided." The jury was unanimous in that it could not be unanimous.

¶ 43    Second, we note the length of deliberations in the context of the trial's duration and complexity. Here, all trial testimony occurred on May 18, 2021 (excluding Blomberg's May 19 testimony that led to the court striking the DNA evidence introduced the day prior), and the trial court noted that the jury was considering approximately five hours of testimony. The jury deliberations exceeded the length of the trial testimony notwithstanding that the only real issue to be decided was defendant's culpability. As to this question, it is reasonable to conclude that the answer was made more complex by the interplay between the DNA evidence that was later stricken and the unobjected-to, though inadmissible, dog-tracking testimony. See *People v. Cruz*, 162 Ill. 2d 314, 366-73 (1994) (holding that dog-tracking evidence is inadmissible to establish any factual proposition in a criminal proceeding due to the dangers of unfair prejudice). We highlight the jury's multiple inquiries to the court regarding the dog-tracking testimony, which supports the inference that it remained focused on the DNA evidence located by the dog, notwithstanding the trial court's admonitions. The disjunction between the length of deliberations and the complexity of the disputed issues made it more probable that coercive pressures would influence the jury.

¶ 44    Third, the trial court's decision to prolong deliberations after the jury stated it could not agree magnified the risk that jurors would consider the improper DNA evidence by adding pressure on the minority to conform with the majority.

¶ 45    We agree with the State that the record contains no evidence of juror coercion or hostility. But our supreme court has stated with clarity that the jury's own statement that it is unable to reach a unanimous verdict is the most important consideration (*Kimble*, 2019 IL 122830, ¶ 39), and that factor predominates here. For the reasons stated, the trial court's denial of defendant's motion for a mistrial was an abuse of discretion.

¶ 46    Recognizing that the error was not preserved where defendant did not raise it in his posttrial motion, defendant argues that the error was so serious that it denied him a fair trial. To excuse forfeiture under the second prong of the plain error rule, a defendant must show that the error was structural. *People v. Moon*, 2022 IL 125959, ¶ 74. An error is generally considered structural "if it necessarily renders a criminal trial fundamentally unfair or is an unreliable means of determining guilt or innocence." *Id.* ¶ 28. Structural errors go beyond the trial process itself—they affect the framework within which the trial proceeds. *Id.* ¶ 29. " 'Put another way, these errors deprive defendants of "basic protections" without which a "criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence *** and no criminal punishment may be regarded as fundamentally fair." ' [Citation.]" *Id.* A defendant's constitutional right to an impartial jury is one such protection. *Id.* ¶ 30. Structural error that deprives a defendant of this protection requires automatic reversal, regardless of the effect of the error on the outcome of the trial. *Id.* ¶ 74.

¶ 47    In *Moon*, the Illinois Supreme Court held that the failure to administer a trial oath to the jury at any time before the jury renders its verdict is structural error. *Id.* ¶¶ 62, 74. The oath itself "preserves the integrity of the jury trial process by impressing upon the jurors their sacred duty to render a true verdict in accordance with the law and evidence, thereby ensuring the defendant's right to an impartial jury is honored by the persons being sworn." *Id.* ¶ 63. The failure to administer the oath "affects the framework within which the trial proceeds, rather than being merely an error in the trial process itself," such that "a criminal trial in front of an unsworn jury cannot reliably serve as a method for determining guilt or innocence." *Id.* ¶¶ 62-64. A conclusion that structural error has occurred depends, in part, on the difficulty of assessing the effect of the error. *Id.* ¶ 66 ("swearing the jury is part of the very framework within which the trial proceeds, but the effect of

a complete failure to administer a jury oath is difficult, if not impossible, to measure because the error concerns the subjective frame of mind of the individual jurors"); see also *People v. Stoecker*, 2020 IL 124807, ¶ 24 (explaining that an error is structural under state law when it "has 'consequences that are necessarily unquantifiable and indeterminate' " (quoting *United States v. Gonzalez-Lopez*, 548 U.S. 140, 150 (2006))).

¶ 48     Several principles demonstrate that the failure to declare a mistrial here was structural error. First, the right to an unbiased jury is necessary to preserve the integrity of the judicial process. See U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *Moon*, 2022 IL 125959, ¶ 32. The trial court, therefore, must be responsive to coercive pressures—including, *e.g.*, government coercion or mob psychology—that could influence the verdict. A jury's unanimous expression that it cannot reach a unanimous verdict, especially after extended deliberations and the provision of the *Prim* instruction, suggests that any later consensus would be the product of coercive pressures. Of course, the effect of the failure to dismiss a jury that has expressed its inability to reach a unanimous verdict under these circumstances depends upon the subjective frame of mind of individual jurors and is, thus, impossible to measure.

¶ 49     The State does not respond to defendant's second-prong argument. Accordingly, we hold that the trial court's failure to grant defendant's motion for a mistrial in these circumstances, after the court gave the *Prim* instruction and the jury later said it could not reach a unanimous agreement, was structural error.

¶ 50     Defendant does not argue that double jeopardy precludes retrial. See U.S. Const., amend. V; Ill. Const. 1970, art. 1, § 10. Regardless, the evidence submitted is sufficient to sustain a conviction, and thus defendant may be retried. See *People v. Olivera*, 164 Ill. 2d 382, 393 (1995).

¶ 51 Because we determine that the trial court committed second-prong plain error, we need not address defendant's other contentions, but we wish to highlight an error that may occur on remand. Defense counsel failed to object when Brown testified about his use of a police canine to follow a scent trail during the investigation. As noted above, this dog-tracking testimony was *per se* improper according to the Illinois Supreme Court in *Cruz*, which is the only court that can reconsider this prohibition. See *Cruz*, 162 Ill. 2d at 369-70; *Du Page County Airport Authority v. Department of Revenue*, 358 Ill. App. 3d 476, 486 (2005) ("It is fundamental to our judicial system that once our supreme court declares the law on any point, its decision is binding on all Illinois courts, and we cannot refuse to follow it, because we have no authority to overrule or modify supreme court decisions."); but see *People v. Montano*, 2017 IL App (2d) 140326, ¶¶ 88-89 (noting that several foreign jurisdictions utilize an individualized approach and sometimes allow dog-tracking testimony to be admitted). On remand, the parties should be aware of express evidentiary prohibitions laid down by our supreme court.

¶ 52                                    III. CONCLUSION

¶ 53 For the reasons stated, we reverse the judgment of the circuit court of Kane County.

¶ 54 Reversed and remanded.

**People v. Richardson, 2022 IL App (2d) 210316**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, No. 19-CF-799; the Hon. Donald Tegeler, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Lilien, and Ann Fick, of State Appellate Defender's Office, of Elgin, for appellant. |
| **Attorneys for Appellee:** | Jamie L. Mosser, State's Attorney, of St. Charles (Patrick Delfino, Edward R. Psenicka, and Diane L. Campbell, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |