Eileen M. BRADY, Martha Brickett, Robert R. Cushing, Jr., Kristie Conrad, Eleanor B. Mullaley, and Kirk M. Stone, Petitioners-Appellants,

v.

Unwar J. SAMAHA, Clerk, Rockingham County Superior Court, Respondent-Appellee.

No. 81–1406.

United States Court of Appeals, First Circuit.

Argued Oct. 9, 1981.

Decided Dec. 18, 1981.

Benjamin Hiller, Cambridge, Mass., with whom Goldstein, Pressman & Stern, and Penn S. Moulton, Cambridge, Mass., were on brief, for appellants.

Brian T. Tucker, Atty., Criminal Justice Division, Concord, N.H., with whom Gregory H. Smith, Atty. Gen., New York City, was on brief, for appellees.

Before BOWNES and BREYER, Circuit Judges, and WYZANSKI,* Senior District Judge.

BOWNES, Circuit Judge.

Defendants-appellants ** were prosecuted in state court on charges of criminal trespass stemming from their arrests at a demonstration at the construction site of the Seabrook nuclear power plant, Seabrook, New Hampshire. The joint trial of the six defendants [1] began on May 8, 1979, and was terminated on May 11 by the trial judge's *sua sponte* declaration of a mistrial. In November, 1979, when their retrial was scheduled, the defendants moved to dismiss based on double jeopardy. After the motion was denied, they appealed to the New Hampshire Supreme Court, which upheld the trial court's mistrial order and found no bar to a second prosecution. *State v. Brady*, 120 N.H. 899, 424 A.2d 407 (1980). Their petition for habeas corpus was denied by the District Court for the District of New Hampshire and they now seek federal appellate relief. Since the disposition of this case depends on a careful review of the trial record, we set out the facts in some detail.

The defendants chose to represent themselves at their jury trial. The judge agreed at the outset that the objections of any one

---

* Of the District of Massachusetts, sitting by designation.

** Eileen M. Brady, Martha Brickett, Robert R. Cushing, Jr., Kristie Conrad, Eleanor B. Mullaley, and Kirk M. Stone.

1. Their pretrial motion for joinder had been granted.

of them would be deemed to be the objections of all. The trial, which lasted three days before the judge terminated it, consisted of the state's case in chief and one day's testimony by defense witnesses.

It was clear throughout their cross-examination of the state's witnesses that the defendants intended to inject the issue of the dangers of nuclear power into the case. Their theory apparently was that their motives in going onto the construction site—publicizing the hazards of nuclear power and acting according to conscience and political beliefs—were relevant to the mental element of trespass, *i.e.*, knowledge that they lacked a license or privilege to be there. N.H.Rev.Stat.Ann. ch. 635, § 2. All of the defendants in their cross-examinations made reference to the potential dangers of nuclear energy. An illustrative example is the following question asked by defendant Conrad: "Are you aware that death and acute illness from nuclear accident would occur in an area 20 miles around the plant, causing thyroid illness, and plant and water contamination?" Defendant Brady asked one of the security guards from the plant, "Do you have any reason to believe that the defendants were present at the site for any other reason than that they believed nuclear power to be dangerous?" [2]

The heart of the defense was the competing harms doctrine, N.H.Rev.Stat.Ann. ch. 627, § 3, which provides in pertinent part: "Conduct which the actor believes to be necessary to avoid harm to himself or another is justifiable if the desirability and urgency of avoiding such harm outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the statute defining the offense charged."

It first became apparent that this defense theory would be used during cross-examination by defendant Mullaley, when she ex-plicitly referred to the competing harms statute. The judge ruled at that time that he would not allow evidence with reference to competing harms because the New Hampshire Supreme Court had held the doctrine inapplicable in another Seabrook plant trespass case, *State v. Dorsey*, 118 N.H. 844, 395 A.2d 855 (1978). Evidently undeterred, Mullaley asked one more question about competing harms, to which the judge sustained an objection.

Despite the judge's prior rulings on competing harms, the opening statements of all six defendants, made at the close of the state's case, referred to the dangers of nuclear power.[3] Then, during his examination of one witness, defendant Stone, again ignoring the court's rulings, attempted to question the witness about the competing harms statute. The judge sustained objections to numerous questions by defendant Cushing relative to nuclear power, sentences in trespass cases, the American judicial system and similar irrelevant topics. Some of these rulings prompted Cushing to argue with the court. The following colloquy is the last such argument in the presence of the jury and, as we read the record, the most extreme:

Q. [by defendant Cushing]: Chuck, do you know anything about the potential for catastrophe at the nuclear power plant?

Mr. McFarlane: I object.

The Court: Sustained. Mr. Cushing, another ruling, this courtroom is not going to be a forum to discuss nuclear power, its dangers, its safety, its necessity or any other issue related to it. That is the order of this trial. Your exception may be noted.

Defendant Cushing: Your honor, the charge says, the charge mentions the word Seabrook nuclear site.

---

2. These and numerous other questions like it were objected to and the objections were almost uniformly sustained. Only rarely did the judge instruct the defendants during such interrogation that the questions were improper and explain why.

3. Defendant Cushing referred specifically to the competing harms statute and was reminded by the court of its ruling. Defendants Brady and Brickett told the jury they had acted for the good of the community in order to prevent harm. Mullaley spoke of the dangers of nuclear power and paraphrased the theory of competing harms, and Stone again made specific reference to the competing harms statute.

The Court: That does not put the issue of nuclear power before this Court. There will be no further interrogation with reference to nuclear power. That is an order of the Court and the law of the trial.

Defendant Cushing: Do you think we went to the site for some reason other than nuclear power?

The Court: Don't argue with the Court, Mr. Cushing.

Defendant Cushing: I am just asking for justice. I am asking to have speech. I am asking to be allowed to present my case before a jury, that is all.

The Court: In the case of *State v. Dorsey* was very clear this type of evidence is not admissible.

Defendant Cushing: That was before Three Mile Island went.

The Court: It is still the law of the State. It will be strictly enforced by this Court. The jury will be excused. I will see you at 9:30 tomorrow morning. The defendants will remain in the courtroom.

After the jury had been sent out, the judge explained his rulings on the inadmissibility of certain evidence since "apparently there [had been] some misunderstanding. . . ." He then advised the defendants to read a case concerning the punishment for contempt[4] and asked if his order was clear. Defendant Stone proceeded to argue with the court regarding its rulings, and the other defendants indicated that they did not understand the order, since they had expected to be able to present a competing harms defense. The judge then stated that in order to prevent misunderstanding he would provide them with a written order the following morning to govern the conduct of the balance of the trial, and adverted to his contempt powers to enforce it.

The next morning, after the defendants had been given copies of the order, the court appointed standby counsel and heard the defendants with regard to the order outside the presence of the jury. When the court stated that one reason for the order was that defendant Cushing had refused to abide by previous oral rulings, defendant Conrad objected, arguing that all six of them had been asking the same kinds of questions and calling the judge arbitrary for singling out Cushing. When it was Cushing's turn to speak, he accused the court of being "personally embroiled" in the case, of setting the defendants up for "a kangaroo court type situation," called the order illegal and the trial a disgrace, and generally vented his anger and frustration at the judge. Later, in a shorter monologue, defendant Stone called the trial a farce and stated that he no longer believed in the American judicial system. At this point, the judge enumerated Cushing's statements, said that he found them all contemptuous, and then declared a mistrial, stating:

Just a moment. The Court finds that those comments are contemptuous. The Court further finds that the actions of Mr. Cushing during the course of this trial would render the continuance of it unfair to the remaining defendants. The Court finds that the defendant Cushing is in contempt of Court and sentences him to fifteen days at the House of Corrections. And the remaining cases,[5] the Court orders a mistrial. Clear the courtroom.

As the above indicates, the mistrial decision was made quickly and without consultation with either standby counsel for the defendants or the prosecutor. Several hours later, the court vacated its contempt order.

The constitutional protection against double jeopardy does more than merely prohibit a second trial after a defendant has been acquitted; it "also embraces the defendant's 'valued right to have his trial

---

**4.** *Town of Nottingham v. Cedar Waters, Inc.,* 118 N.H. 282, 385 A.2d 851 (1978).

**5.** Appellants contend this language refers to the "remaining" five defendants and that, therefore, no mistrial was declared as to Cushing. We agree with the State that "the remaining cases" refers to the six criminal trespass cases as distinguished from Cushing's contempt citation.

completed by a particular tribunal.' " *Arizona v. Washington*, 434 U.S. 497, 503, 98 S.Ct. 824, 829, 54 L.Ed.2d 717 (1978) (footnote omitted), quoting *Wade v. Hunter*, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949). The principle behind this protection

> is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

*Green v. United States*, 355 U.S. 184, 187–88, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957).

■ While recognizing the importance of the defendant's right to have his trial completed by a particular tribunal, the Supreme Court has determined that certain circumstances present in the first trial may justify subordinating that right "to the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury." *Arizona v. Washington*, 434 U.S. at 505, 98 S.Ct. at 830; *Wade v. Hunter*, 336 U.S. at 688–89, 69 S.Ct. at 836–37. But when this "valued right" is frustrated by the declaration of a mistrial over the defendant's objection, the prosecution has a heavy burden to show that the mistrial was justified by "manifest necessity." *Arizona v. Washington*, 434 U.S. at 505, 98 S.Ct. at 830.

"Manifest necessity," *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824), has been interpreted by the Supreme Court to mean a "high degree" of necessity, and its existence *vel non* will depend on the type of problem at trial that prompts the judge to consider a mistrial. *Arizona v. Washington*, 434 U.S. at 506, 98 S.Ct. at 831.

■ When the trial judge has identified possible jury bias as the ground for his mistrial order, his "determination is entitled to special respect." *Id.* at 510, 98 S.Ct. at 833. In this case, the trial judge ordered a mistrial because he felt the actions of defendant Cushing "during the course of this trial would render the continuance of it unfair to the remaining defendants." Even assuming that the trial judge is in the best position to assess the prejudicial impact of trial events on the jury and, therefore, deserving of our deference, he "must always temper the decision whether or not to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate." *United States v. Jorn*, 400 U.S. 470, 486, 91 S.Ct. 547, 557, 27 L.Ed.2d 543 (1971) (plurality opinion), quoted in *Arizona v. Washington*, 434 U.S. at 514, 98 S.Ct. at 834. Our duty as a reviewing court is to assure ourselves that the trial judge engaged in a "scrupulous exercise of judicial discretion" in making the decision that a mistrial was necessary. *United States v. Jorn*, 400 U.S. at 485, 91 S.Ct. at 557.

In *Arizona v. Washington*, where a mistrial was declared due to possible jury bias based upon improper opening argument by defense counsel, the Supreme Court reviewed the record surrounding the mistrial declaration to determine whether the judge had exercised sound discretion. The Court found that the trial judge did not act precipitately but rather proceeded with caution after the prosecutor moved for a mistrial, at first denying the motion. Moreover, before finally ruling the following day that a mistrial was necessary, the judge gave both counsel an opportunity to present extensive argument on the need for a mistrial, during which defense counsel urged the less drastic alternative of curative instructions. *Id.* at 514–15 n.34, 98 S.Ct. at 834–35 n.34. In short, by hearing counsel and avoiding a hasty decision, thus "evincing a concern for the possible double jeopardy consequences of an erroneous ruling, . . . the trial judge acted responsibly and deliberately, and accorded careful consideration to respondent's interest in having the trial concluded in a single proceeding." *Id.* at 515–16, 98 S.Ct. at 835.

Since the *Perez* decision, the Supreme Court has refused to apply the manifest necessity standard in a rigid or mechanical fashion, due to the diverse situations that might require a mistrial. *Arizona v. Washington*, 434 U.S. at 506, 98 S.Ct. at 830; *Illinois v. Somerville*, 410 U.S. 458, 462, 93 S.Ct. 1066, 1069, 35 L.Ed.2d 425 (1973). The one constant is that the actions of the trial judge in arriving at the decision to declare a mistrial have been scrutinized in an effort to ensure that a "scrupulous exercise of judicial discretion" led to the decision. *United States v. Jorn*, 400 U.S. at 485, 91 S.Ct. at 557. Whether or not the record indicates he has considered alternatives to a mistrial is significant. *Id.* at 487, 91 S.Ct. at 558; *Harris v. Young*, 607 F.2d 1081, 1085 (4th Cir. 1979), *cert. denied*, 444 U.S. 1025, 100 S.Ct. 688, 62 L.Ed.2d 659 (1980); *United States v. Pierce*, 593 F.2d 415, 417 (1st Cir. 1979); *United States v. Sanders*, 591 F.2d 1293, 1298 (9th Cir. 1979); *United States v. McKoy*, 591 F.2d 218, 223 (3d Cir. 1979); *Dunkerley v. Hogan*, 579 F.2d 141 (2d Cir. 1978), *cert. denied*, 439 U.S. 1090, 99 S.Ct. 872, 59 L.Ed.2d 56 (1979); *United States v. Starling*, 571 F.2d 934, 941 (5th Cir. 1978). Also of major importance is affording counsel an opportunity to be heard on the subject. *Arizona v. Washington*, 434 U.S. at 514–15 n.34, 515–16, 98 S.Ct. at 834–35 n.34, 835; *Grandberry v. Bonner*, 653 F.2d 1010, 1015 (5th Cir. 1981); *United States v. Hotz*, 620 F.2d 5, 7 (1st Cir. 1980); *United States v. Pierce*, 593 F.2d at 417, 419; *United States ex rel. Russo v. Superior Court of New Jersey*, 483 F.2d 7, 15 (3d Cir. 1973).

Embracing both these factors—consideration of alternatives and consultation with counsel—is the amount of time devoted by the judge to the mistrial decision. A precipitate decision, reflected by a rapid sequence of events culminating in a declaration of mistrial, would tend to indicate insufficient concern for the defendant's constitutional protection. *United States v. Jorn*, 400 U.S. at 487, 91 S.Ct. at 558; *Grandberry v. Bonner*, 653 F.2d at 1015–16; *United States v. Starling*, 571 F.2d at 941. *See Arizona v. Washington*, 434 U.S. at 515, 98 S.Ct. at 835.

Hence, although a reviewing court may defer to the trial court's discretion to make a mistrial decision, "[i]f the record reveals that the trial judge has failed to exercise the 'sound discretion' entrusted to him, the reason for such deference by an appellate court disappears." *Arizona v. Washington*, 434 U.S. at 510 n.28, 98 S.Ct. at 832 n.28.

Having carefully reviewed the entire record in this case, we conclude that the trial judge failed to engage in a scrupulous exercise of discretion in declaring a mistrial.[6] As in *Arizona v. Washington*, he based his decision on possible jury bias.[7] But there the similarity ends. The *Washington* trial judge listened to counsel, deliberated, and expressed his concern for the double jeopardy implications of his ruling, thus persuading the Supreme Court that he had acted responsibly in light of the importance of the defendant's constitutional right. 434 U.S. at 515–16, 98 S.Ct. at 835.

The actions of the trial court in this case, by contrast, indicate anything but deliberation and concern for the defendants' protected interest in completing the trial. Although he had appointed standby counsel for them only minutes before, the judge did not confer either with him or with the prosecutor before making the decision. We have found this improper on previous occa-

---

**6.** We view the inquiry into the judge's discretion and the existence *vel non* of manifest necessity as a question of law or, at most, a mixed question of law and fact. *United States ex rel. Russo v. Superior Court of New Jersey*, 483 F.2d 7, 15 (3d Cir. 1973). Since, therefore, this is not a habeas corpus factual review, our analysis is not governed by *Sumner v. Mata*, 449 U.S. 764, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). *See* 28 U.S.C. § 2254(d).

**7.** The parties have assumed, as did the New Hampshire Supreme Court and as do we, that the reason for the mistrial was that the trial judge thought that defendant Cushing's conduct had biased the jury. This was, however, not explicitly stated by him and the outburst that precipitated the mistrial declaration occurred outside the jury's presence.

sions. *United States v. Hotz*, 620 F.2d at 7; *United States v. Pierce*, 593 F.2d at 417, 419.

Nor did the trial judge consider any alternatives to a mistrial, such as severance or curative instructions.[8] The rapid sequence of events during the morning of his final encounter with the defendants reflects a spontaneous decision that could hardly be the result of scrupulously sound discretion.[9] On the contrary, the apparent failure of the judge to consider alternatives and the abruptness with which he acted resemble the actions of the trial judge "that can fairly be described as erratic" denounced in *United States v. Jorn*. *Illinois v. Somerville*, 410 U.S. at 469, 93 S.Ct. at 1073. "[T]he pace at which the proceedings culminating in the judge's declaration of a mistrial moved indicates that the judge could not possibly have considered carefully any alternatives to declaring a mistrial. It was only a matter of minutes. . . ." *Grandberry v. Bonner*, 653 F.2d at 1015. In sum, a decision obviously made so precipitately could not have been the product of any careful consideration of the valued right of the defendants to have

their guilt or innocence determined at that trial.[10] *United States v. Jorn*, 400 U.S. at 486, 91 S.Ct. at 557; *Grandberry v. Bonner, supra; United States v. Starling*, 571 F.2d at 941.

In its opinion below, the New Hampshire Supreme Court held that the trial judge had acted within his discretion. The Court pointed to the judge's instruction to the defendants to read a case on contempt as support for its conclusion that he did not act "without consideration" when faced with the defendants' potential reactions to his evidentiary rulings. *State v. Brady*, 120 N.H. at 902, 424 A.2d at 409. But there is nothing in the record to indicate that the judge was considering a mistrial at that time. Moreover, the test is not whether the judge considered that he had a potential problem on his hands but rather whether he "accorded careful consideration to [the defendants'] interest in having the trial concluded in a single proceeding." *Arizona v. Washington*, 434 U.S. at 516, 98 S.Ct. at 835. With the record barren of any hint whatsoever that the judge was aware of the

---

8. Indeed, the court's contempt power, a possible alternative certainly less drastic, was used in conjunction with the mistrial order rather than in lieu of it.

   Regarding the alternative of curative jury instructions, we find an analog in decisions involving multiple defendant trials in which outbursts of one defendant were claimed by a codefendant to be so prejudicial as to require severance, a mistrial, or a new trial. In these cases, where the disruptions were at least as serious as those involved here, if not more so, careful instructions to the jury were held to be adequate. *United States v. Tashjian*, 660 F.2d 829 (1st Cir. 1981); *United States v. Smith*, 578 F.2d 1227 (8th Cir. 1978); *United States v. Bamberger*, 456 F.2d 1119 (3d Cir.), *cert. denied*, 406 U.S. 969, 92 S.Ct. 2424, 32 L.Ed.2d 668 (1972).

9. The actions of the trial judge in this case can be contrasted to those of the judge in our recent decision in *Reinstein v. Superior Court*, 1 Cir., 661 F.2d 255 (1981). There, we upheld the trial court's finding of manifest necessity to declare a mistrial based on possible jury bias after the defendant's family had twice published an ad in a widely-read publication regarding his trial. Showing apparent concern for the defendant's double jeopardy interests, the judge in *Reinstein* consulted with counsel and rejected the alternative of jury sequestration.

The "careful consideration," at 258, by the trial judge of all the circumstances, reflected in the record, led to our deference to his manifest necessity determination.

10. Later, on the same day that he declared a mistrial, the trial judge heard the defendant Cushing on his petition for habeas corpus relative to his contempt citation. He listened to both standby counsel and the defendants' law student friend, appellate counsel here, on the propriety of his contempt order. Both indicated they thought the order was in violation of the very case the court had cited the previous day, which requires that the contemnor be given an opportunity to be heard prior to sentencing. The court then stated that it had "reflected upon the situation somewhat," and that "[in] any case, where emotions run high, difficulties are going to be encountered, not only by the Court but by the parties involved." Acknowledging that the difficulties were in part caused by the pro se defendants' ignorance of courtroom procedures, rules of evidence, and state laws, the court decided that "justice would not be served" by holding Cushing in contempt and vacated its order.

This emphasizes the desirability of consulting with counsel prior to declaring a mistrial.

double jeopardy implications of his decision, we cannot agree that his discretion was sound.

We appreciate the trial judge's difficulties in this situation. He had spent three days listening to a string of irrelevant questions, was the target of arguments over his rulings in open court, and was subjected to unbridled attacks on his fairness. But encounters with obstreperous counsel and even outright rudeness are unfortunately not an uncommon occurrence in the trial courts today. Where a constitutional right of the magnitude of the protection against double jeopardy is involved, we cannot defer to the judgment of the trial judge where the circumstances make that judgment so manifestly suspect.

*Vacated and remanded with directions to grant the writ.*