2025 IL App (1st) 240275-U

No. 1-24-0275

THIRD DIVISION
May 21, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 23 DV 40290 01 |
| | ) | |
| DONNELL TAYLOR, | ) | Honorable |
| | ) | Terence MacCarthy, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE D. B. WALKER delivered the judgment of the court.
Presiding Justice Lampkin and Justice Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*: We reverse the circuit court's judgment denying defendant's motion to dismiss his indictment where the circumstances leading the court to declare a mistrial *sua sponte* did not demonstrate a manifest necessity for a mistrial.

¶ 2    Defendant Donnell Taylor appeals the judgment of the trial court denying his motion to dismiss his indictment following the court's *sua sponte* grant of a mistrial. On appeal, defendant contends that the trial court should have dismissed his indictment on double jeopardy grounds

where there was no manifest necessity for a mistrial. For the following reasons, we reverse the trial court's judgment.

¶ 3                                    I. BACKGROUND

¶ 4     Defendant was arrested on August 12, 2023, and charged with one count of violating a stalking no contact order and two counts of resisting a peace officer. The matter was set for trial on October 30, 2023, and on that day, both parties answered that they were ready for trial.

¶ 5     After a brief recess, the parties reconvened in court. Defense counsel stated that Metra police officers told him during the break that surveillance video existed of the alleged incidents at the station. Counsel argued that the videos were available to the State. When the trial court asked the prosecutor about the videos, he responded that the State did not possess any video recordings of the incident. The following exchange occurred:

"THE COURT: Well, neither party has the videos then.

[DEFENSE COUNSEL]: Right. But, Judge, those are videos of the incident that I wasn't aware of even existing until about 30 seconds ago. Those were tendered to the State and available for the State to pick up. That's what the [Metra] police office does and has. I'm happy to still proceed today, but I ask for some form of sanctions based on that.

THE COURT: State, were you aware of this?

[ASSISTANT STATE'S ATTORNEY]: No, Judge. To my knowledge –

THE COURT: You are aware of it now.

[ASSISTANT STATE'S ATTORNEY]: Yes.

THE COURT: *** [W]e had a jury status date previously, a couple weeks ago, where both sides told me all discovery was tendered. Both sides said that it was tendered. So I

take the State at their word and, Defense, I take you at your word where both sides indicated that everything was tendered.

* * *

THE COURT: State, do you intend to present those videos?

[ASSISTANT STATE'S ATTORNEY]: No, Judge.

[DEFENSE COUNSEL]: Judge, what I would say is the appropriate sanction is that any testimony as to what could have happened that would have been on those videos, *** if anyone is going to testify that [defendant] did something that would have been on that video, then that should either not be allowed or that it should come in with a limiting instruction based on the fact that there could have and should have been video tendered.

THE COURT: Well, I'm not going to preclude the State from calling their witnesses. The State is indicating that they don't intend to present the videos. Certainly, I would not preclude you, [defense counsel], from cross-examining about the fact that videos exist. And at the appropriate, perhaps, the better way to proceed would be to give a cautionary instruction with regard to the fact that there were videotapes – there was a video available and has not been presented. And you can, perhaps, prepare that over lunch. Present that to the Court and show it to the State.

[DEFENSE COUNSEL]: Thank you, Judge.

THE COURT: State?

[ASSISTANT STATE'S ATTORNEY]: Sounds good.

THE COURT: I'm sorry. Are the videos in the courtroom here?

[DEFENSE COUNSEL]: No. But they are available to be picked up at any moment.

THE COURT: State, you are indicating you are ready to proceed; is that correct?

[ASSISTANT STATE'S ATTORNEY]: We are.

THE COURT: Defense, you are indicating that you are ready to proceed?

[DEFENSE COUNSEL]: Yes, Judge.

THE COURT: All right. ***"

¶ 6    The matter proceeded to jury selection and after the jury was sworn, the parties presented their opening statements. The State told the jury that defendant "spends a lot of time at Millennium Station. He loiters there. Sometimes all day. Since August of 2022 the defendant has been harassing [Ms. Locke] as she passes through the station." He would sometimes engage in unwanted conversation with her, block her in the stairway, or yell and follow her. Ms. Locke obtained a stalking no contact order against defendant, which he violated. When the police approached defendant about this violation, he ran away thereby resisting arrest.

¶ 7    In his opening statement, defense counsel told the jury that defendant struggled with homelessness and to make money, he opened doors for commuters at the Millennium Park Metra Station for tips. Defendant had been doing this for almost a decade. Counsel stated that defendant had "one negative interaction" with Ms. Locke that resulted in the stalking no contact order. Counsel told the jury that defendant "opens the door for thousands of people every day. He doesn't remember [Ms. Locke]." Therefore, he could not knowingly and intentionally "make contact" with someone he did not know. Regarding the charges of resisting arrest, counsel stated that the day before his arrest, defendant was treated for an eye infection that limited his vision. He did not know that the "group of people *** moving very quickly in his direction" were police officers. He ran for about 30 feet before they identified themselves as the police. Counsel stated that defendant then "stopped and didn't commit any other physical act of resistance."

¶ 8      The State's first witness was Jasmine Locke. Locke testified that she passed through Millennium Park Metra Station on her way to and from work. In the summer of 2022, defendant tried to interact with her by extending his hand and saying "Hey, friend, can I talk to you?" Locke made it "visibly known" that she did not care for the interaction. Defendant's attempts at conversation escalated to blocking Locke's path as she tried to leave the station. The unwanted interaction caused Locke to obtain a stalking no contact order. She identified defendant in court.

¶ 9      On August 9, 2023, Locke entered the station and observed defendant yelling, "She's lying. I didn't do anything." She called a sergeant she had been in contact with to let him know that defendant was at the station. Defendant was yelling at commuters and "whoever would listen." Locke was standing near Metra personnel when she saw defendant bolt around the corner. He was walking quickly towards her. Locke testified that when defendant noticed officers at the scene, he fled. She later learned that officers had "lost him in the Millennium Station parking lot." Locke filed a police report.

¶ 10     On cross-examination, Locke acknowledged that defendant was yelling before she entered the station. She stated that defendant never made physical contact with her, although he was "staring in [her] direction" as he continued to shout. Locke also testified that defendant never contacted her outside of the station, nor did he attempt to follow her home.

¶ 11     Metra Police Officer Brandon Henley testified that he was working on July 31, 2023, when he observed defendant at the station holding doors for people. Officer Henley had an "understanding" about defendant. He had "multiple contacts with [Metra Police] and he had been warned about trespassing." Officer Henley took defendant into custody and discovered that he had an order of protection against him but he had not been served. After processing defendant at the

station, Officer Henley served him with the order of protection. The service was recorded on the officer's body worn camera, and the video was entered into evidence.

¶ 12    On cross-examination, defense counsel asked Officer Henley about surveillance cameras at the Millennium Park station. The officer testified that he did not know how many cameras were in the station, but he understood that the cameras recorded "24/7." He stated that Metra police do not have access to the cameras. Instead, there is a "dedicated division that's in charge of surveillance for our buildings." Officer Henley also testified that defendant told him numerous times that he did not know Locke.

¶ 13    Sergeant Atha Hunt testified that on August 9, 2023, he was working for the Metra police department. That day, he had received a call from Locke. After their conversation, he notified dispatch that a "pedestrian trespasser" was present at the station. Sergeant Hunt identified defendant as the trespasser. Defendant was arrested at the scene.

¶ 14    On cross-examination, Sergeant Hunt stated that he had warned defendant three times about entering the station without an intent to use public transportation, and that he had arrested defendant once before for trespassing. However, he had never observed defendant acting violently against commuters.

¶ 15    Defense counsel then asked about the surveillance cameras at the Millennium Park station. Sergeant Hunt testified that the cameras were operated by a separate division within the Metra police department. Counsel's cross-examination of Sergeant Hunt continued:

"Q. So in terms of when a case is brought, when a prosecutor picks up a case from your office, how do you go about getting them the information that they need?

A. Once you receive a subpoena for whatever documents that are necessary, or whatever they are requesting as far as video, body camera footage, then we would link

- 6 -

them to our digital services manager, Jennifer Matthews, and she would prepare whatever video evidence to surrender, and then our court officer would prepare whatever documents [are] necessary."

Sergeant Hunt testified that there were instances where the manager was unable to obtain digital evidence because the cameras were not functional. He did not know whether the cameras were functioning on the day of the incident, or whether any video evidence existed. He did not know if the State was provided a link to digital evidence in this case.

¶ 16    Outside the jury's presence, the trial court inquired whether the parties had instructions to proffer. The State answered that it had no instructions. Defense counsel, however, submitted a proposed instruction to which the State objected. The instruction read as follows:

"If a party to this case has failed to offer evidence within their power to produce, you may infer that the evidence would be adverse to that party if you believe each of the following elements:

1. The evidence was under the control of the party and could have been produced by the exercise of reasonable diligence.

2. The evidence was not equally available to an adverse party.

3. A reasonably prudent person under the same or similar circumstances would have offered the evidence if he believed it to be favorable to him.

4. No reasonable excuse for the failure has been shown."

¶ 17    The State objected to the instruction. It argued that the instruction incorrectly implied that the State possessed exculpatory evidence in the form of a video recording. Although they now know a recording exists, they do not know whether the cameras captured the incident involving

defendant. The State asserted that they were informed of the video's existence by defense counsel on the morning of trial.

¶ 18    The trial court questioned defense counsel about the video.

"THE COURT: *** [Defense counsel], have you ever subpoenaed the records in this matter? Have you subpoenaed anything in this matter?

[DEFENSE COUNSEL]: I have not, Judge. I have relied on the State turning over the evidence that was in their control. And, Judge, as to that particular issue, in this jury instruction that is addressed. And it's a question for the jury to determine. The evidence was not equally available to an adverse party. And the jury can make the determination if they feel that it was equally available.

THE COURT: Assuming this was available via subpoena, how is it not available to you? If it was available via subpoena and you never subpoenaed the evidence.

[DEFENSE COUNSEL]: Judge, I simply relied on [*sic*] that the State would provide me the evidence that they have that's within their control. That is their obligation.

THE COURT: I know. And, presumably, they did do that. And they were only made aware of *** the video evidence this morning.

[DEFENSE COUNSE]: But they should not have been, Judge. Because I became aware of it through a one second conversation with the police officer that they've spoken with many times.

THE COURT: Well, but the fact is they are not aware. And I take them at their word that they weren't aware of that. So, you found out about it this morning. And does either party wish to look at that video to see what's on the video?

Defense, do you wish to look at that video?

- 8 -

[DEFENSE COUNSEL]: Of course I would, Judge. I asked this morning and then that was denied.

THE COURT: What was denied?

[DEFENSE COUNSEL]: I said –

THE COURT: No, no, no, that wasn't denied. Are you making a motion for a mistrial? Are you making a motion for a mistrial?

[DEFENSE COUNSEL]: No, I'm not, Judge. But I –

THE COURT: You never asked to view something. Asking to view something would have been saying I want a continuance in this case. Well, we hadn't started the trial, so it would have been asking for a continuance. You never did that. You proceeded to trial. Both sides answered ready.

[DEFENSE COUNSEL]: I brought the issue to your attention this morning.

Judge, I think that these jury instructions are completely fair. If the issue at hand is maybe I should have gotten it, this allows the jury –

THE COURT: Part of the issue is, yes, that you should have subpoenaed things involved in your case, yes.

\* \* \*

THE COURT: But is the indication, -- just so I'm clear, is the indication that there was video footage of what happened in this incident? Yes or no? Can anybody tell me that?

[DEFENSE COUNSEL]: Judge, the indication was that they have video of every single day, every single second, every single hour in that station. And as their practice they send that to the Office of the State's Attorney. That was their testimony.

THE COURT: Again, you didn't ask for a continuance. You wanted to proceed without viewing that.

[DEFENSE COUNSEL]: No, I didn't, Judge. I asked for a limited – I asked –

THE COURT: A limited instruction, but not for a continuance.

[DEFENSE COUNSEL]: Judge, I did. I asked –

THE COURT: Hear me out. Those are two different things.

[DEFENSE COUNSEL]: I asked for both of them. I said either a continuance or in the alternative I would ask –

THE COURT: I don't recall. Maybe I'm wrong. I don't recall you asking for a continuance in this case.

[DEFENSE COUNSEL]: Judge –

THE COURT: I don't recall you asking for a continuance. What I'm going to do is I'm going to sua sponte grant a mistrial in this case. We'll hold the matter until next week so that both parties can go ahead and get this evidence. And in the future –

[DEFENSE COUNSEL]: Judge –

THE COURT: I am going to grant the mistrial in the case, counsel. I am going to grant a mistrial. We are going to come back next week so both parties can get this. And there's going to be no question so that both parties – maybe it's favorable. Maybe it's not. I don't know.

THE DEFENDANT: Judge, I got a family.

THE COURT: Sir, please don't interrupt.

The defense doesn't know. The State doesn't know. Nobody knows. So at that point we will come back next week.

[DEFENSE COUNSEL]: Judge, but there are – there are processes in place for this exact –

THE COURT: No. The process is to grant a mistrial. You never asked for – and you're telling me you don't know what is on it. The State doesn't know what's on it. And how are we going to proceed without this evidence?

[DEFENSE COUNSEL]: Judge, I'm not saying how are we going to proceed without this evidence.

THE COURT: The State is objecting to this [instruction]. *** I want whatever jury is going to hear this case to be able to have the benefit of any evidence that is out there.

[DEFENSE COUNSEL]: Judge –

THE COURT: The fact of the matter is you're telling me that there's something out there. You didn't ask for a continuance. I don't believe – I can have June read back the record. I don't believe you ever asked for a continuance. Because in all likelihood, I would have granted a continuance. If there was evidence you didn't have, in all likelihood I would have granted you a continuance. I don't believe you asked for a continuance.

[DEFENSE COUNSEL]: Judge –

THE COURT: You can't have it both ways.

[DEFENSE COUNSEL]: I'm not asking to have it both ways.

THE COURT: You are. You're ready or not ready. I'm not – this is –

[DEFENSE COUNSEL]: Judge, I said I'm answering ready and I'm asking for a limiting instruction. Right? That is –

THE COURT: I understand.

[DEFENSE COUNSEL]: That's what I'm asking for right now and that's what you granted. And now that I'm asking for the limiting instruction, now all of a sudden it's a mistrial. That is not fair and that's not consistent with the order that was issued.

DEFENDANT: I missed all three of my kids –

THE COURT: Sir.

DEFENDANT: This is my life.

[DEFENSE COUNSEL]: Judge, we had a conversation this morning. I said I would answer ready if I can bring down a limiting instruction at lunch. That was the understanding. I have now brought that down.

THE COURT: What I'm going to do is a mistrial will be granted sua sponte. We're going to hold this matter over. ***

* * *

THE COURT: By agreement. This will go by agreement to November 6, 2023. Status at 9 a.m.

DEFENDANT: I plead guilty.

THE COURT: Sir, we will see you back in court on November 6th. That will be the order. November 6th.

And I admonish both parties to please do everything in your power to get that, presumably today, if it exists. It's all something that's available today. Get that. And we should never be in this position again.

And I just want the record to be clear that we've had jury status dates on this matter. We've had trial status dates and jury status dates on at least two occasions in this matter, and at that time both parties told me that all of the evidence in this matter was complete.

So what I want to make sure for [defendant]'s part is that you, as his counsel, have whatever you should have to represent him in this case.

Mistrial will be granted."

The jury was brought into the courtroom, and the trial court dismissed the jurors from the case.

¶ 19    On November 13, 2023, the trial court heard defendant's motion to remove the financial condition of his pretrial release. Defense counsel argued that defendant had been in custody for 93 continuous days on a non-violent charge. He argued that it "was an inordinate amount of time for this particular charge. *** The only reason he's still in custody is because he cannot afford to post $750.00." The assistant state's attorney responded that she did not "believe this is a detainable offense," and she would understand if the court ordered defendant released. She asked that if the court were to release defendant, he be released subject to GPS monitoring around the train station. The trial court ordered defendant released with conditions including GPS.

¶ 20    Defendant also filed a motion to dismiss on double jeopardy grounds. Therein, he argued that he did not consent to the mistrial and there was no manifest necessity for the mistrial. Rather, the trial court and defense counsel had a "heated discussion" focused solely on whether counsel had requested a continuance. Defendant alleged that after the jury was dismissed, defense counsel spoke with the jurors and "[e]very single juror indicated that they were going to acquit [defendant.]"

¶ 21    On December 14, 2023, the trial court heard arguments on the motion. Defense counsel addressed a number of factors relevant to determining whether manifest necessity required a mistrial. He argued that the trial court did not devote much time to the issue where its decision took place over "a couple pages" of transcript. Counsel also noted that the discussion at the time was "heated." He admitted it may have been a "mistake" not to subpoena the video himself but

argued that the grant of a mistrial was not an appropriate sanction. Counsel stated that he did not seek a continuance because he believed they had agreed to the proper procedure moving forward. As counsel explained, "that discovery issue and what the sanction should have been or should not have been was simply what your Honor had asked me to come down and propose, and then your Honor was free to grant or deny that limiting instruction." Instead, an argument ensued. Shortly thereafter, "a sua sponte mistrial was declared over defense strenuous objection without a word from the State." Counsel argued that the trial court's *sua sponte* grant of a mistrial deprived defendant of having his case decided by a particular tribunal.

¶ 22    The State argued that counsel should have sought a continuance initially if he believed exculpatory evidence existed in the case. It further argued that it would have been error for the court to give defense counsel's proposed instruction. The instruction improperly implied that the State possessed exculpatory evidence it did not have. The State additionally argued that, if exculpatory evidence existed, a limiting instruction would not have protected defendant from the prejudice caused by the failure to produce that evidence. As such, the trial court properly declared a mistrial where the verdict would have been "reversed due to obvious procedural error."

¶ 23    The trial court issued its oral ruling. After addressing preliminary matters, the court stated that it had "exercised, obviously, discretion based on the public's interest in a fair trial, the truth-seeking process, and the facts of the trial and declared a mistrial without prejudice." The court found that it did not make a "hasty" decision, but instead "considered all the alternatives before declaring a mistrial, including curative instructions, admonitions, and striking testimony."

¶ 24    The trial court reasoned:

> "This was a situation where at trial, defense counsel indicated, and, again, I quote, that he would be happy to proceed today, quote unquote before the Court ever mentioned

the possibility of any type of curative instruction. This was a situation where neither side, including the defense, ever subpoenaed the videos in question. This was a situation where the videos in question before the trial started, and I quote again, as defense counsel indicated, could be picked up at any moment. But they weren't picked up. This was a situation further where defense counsel never asked to pass the case to review the videos. This was a situation where the defense never asked for a continuance to review the videos.

Now, the issue of prejudice to the defendant was inherent in the entire discussion of what happened before we started this trial.

I certainly take it very seriously to call out any defense counsel's ineffectiveness on the record, and perhaps I do so to be polite. And perhaps in this matter, the Court erred in not doing so, and next time, given what's happened here, I'll spread of record the phrase ineffective assistance of counsel on the record so that the record is more clear.

But, clearly, based on what happened, the issue of prejudice was clear based on the record. It would, in the Court's mind, clearly would [*sic*] have been ineffective assistance of counsel for the defense to proceed and finish the trial without knowing what, if anything, was on those videos. In fact, the defendant would have been prejudiced by proceeding to trial without knowing what was on those tapes.

The defendant does not at this point get the benefit of a double jeopardy claim when completing this trial without critical evidence would have been ineffective assistance of counsel.

In fact, in the defense argument, defense counsel correctly noted that an ineffective assistance claim could have been made on appeal. In arguments, further, defense counsel admitted, and I quote, his mistake in not pursuing the appropriate discovery, and that was

defense counsel's quote, it was a mistake. He further referenced doing so on all future cases; that is, pursuing all discovery on all future cases.

As for Mr. Taylor, respectfully, the future is now, and Mr. Taylor deserves a fair trial where all the discovery is complete and available to both parties.

And, certainly, clearly, it was a manifest necessity that gave rise to the Court exercising discretion in granting a mistrial in this case.

So at this time, respectfully, the defense Motion to Dismiss is respectfully denied."

¶ 25    Defendant filed this appeal.

¶ 26                                II. ANALYSIS

¶ 27    Defendant contends that the trial court erred in declaring a mistrial where there was no manifest necessity for a mistrial, and a second trial would violate his constitutional right against double jeopardy. Therefore, the trial court should have granted his motion to dismiss the charges.

¶ 28    The Fifth Amendment of the United States Constitution prohibits placing a defendant in jeopardy twice for the same offense. *U.S. v. Jorn*, 400 U.S. 470, 479, 91 S.Ct. 547, 554, 54 L.Ed.2d 543 (1971). This provision "represents a constitutional policy of finality for the defendant's benefit in federal criminal proceedings." *Id*. Society's interest in the finality of criminal judgments "is so strong that an acquitted defendant may not be retried even though 'the acquittal was based upon an egregiously erroneous foundation.' " *Arizona v. Washington*, 434 U.S. 497, 503, 98 S.Ct. 824, 829, 54 L.Ed.2d 717 (1978), quoting *Fong Foo v. United States*, 369 U.S. 141, 143, 82 S.Ct. 671, 672, 7 L.Ed.2d 629 (1962). Thus, when a defendant has been acquitted, "the Constitution conclusively presumes that a second trial would be unfair." *Id*. The Fifth Amendment applies to the states through the Fourteenth Amendment. *People v. Kimble*, 2019 IL 122830, ¶ 28.

¶ 29    Similarly, the Illinois constitution provides that "[n]o person shall be compelled in a criminal case to give evidence against himself nor be twice put in jeopardy for the same offense." Ill. Const. 1970, art. I, § 10. Our supreme court interprets this double jeopardy provision "identically to the federal provision." *Kimble*, 2019 IL 122830, ¶ 28.

¶ 30    Since jeopardy attaches when the jury has been impaneled and sworn, this provision also protects a defendant's right to have his or her trial completed by a particular tribunal. *Id*. As such, a defendant may be spared from the burden of a second trial, even if the first trial did not result in a judgment on the merits. *Id*. However, unlike the constitutional right of a defendant who has been acquitted, the right to be judged by a particular tribunal " 'must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments.' " *Jorn*, 400 U.S. at 480, 91 S.Ct. at 554-55, 27 L.Ed.2d 543, quoting *Wade v. Hunter*, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949). Therefore, when the trial court declares a mistrial, retrial of the defendant does not offend double jeopardy principles if (1) the defendant consents to the mistrial or (2) a manifest necessity for the mistrial exists. *Kimble*, 2019 IL 122830, ¶ 32.

¶ 31    The manifest necessity standard cannot be applied mechanically "without attention to the particular problem confronting the trial judge." *Washington*, 434 U.S. at 506, 98 S.Ct. at 830-31, 54 L.Ed.2d 717. Although strict necessity is not required, the standard does require a "high degree" of necessity for a court to find that a mistrial is appropriate. *Id*. Given a defendant's valued right to have his or her trial completed by a particular tribunal, the power to declare a mistrial "ought to be used with the greatest caution under urgent circumstances, and for very plain and obvious causes." *Jorn*, 400 U.S. at 481, 91 S.Ct. at 555, 27 L.Ed.2d 543. Even if the problem "reflects error on the part of one counsel or the other," the trial court must not foreclose defendant's option to obtain a verdict from a potentially favorable tribunal without "a scrupulous exercise of judicial

discretion." *Id*. at 486, 91 S.Ct. at 558, 27 L.Ed.2d 543. The trial court's decision to declare a mistrial must be tempered by its consideration of "the importance to the defendant of being able, once and for all, to conclude his confrontation with society through a verdict of a tribunal he might believe to be favorably disposed to his fate." *Id*. The declaration of a mistrial is a matter within the trial court's sound discretion, and double jeopardy concerns do not arise absent an abuse of that discretion. *People v. Dahlberg*, 355 Ill. App. 3d 308, 315 (2005).

¶ 32 Both federal and Illinois courts have held that the declaration of a mistrial, made in haste and without due consideration of the defendant's right to have his trial completed by a particular tribunal, prohibits retrial of the defendant on double jeopardy grounds. In *Brady v. Samaha*, 667 F.2d 224 (1st Cir. 1981), the defendants were charged with criminal trespass stemming from a demonstration held at the site of a nuclear power plant in New Hampshire. The defendants elected to represent themselves at the jury trial. Through their cross-examination of the state's witnesses, it became clear that their strategy was to emphasize the dangers of nuclear power by raising the competing harms doctrine. *Id*. at 226. The trial court ruled, however, that it would not allow such evidence because the state supreme court had held the doctrine inapplicable in another nuclear plant trespass case. *Id*.

¶ 33 The defendants argued against the ruling and the court issued a written order setting forth their required conduct for the balance of the trial. *Id*. at 227. The next morning, the court gave the defendants copies of the order and appointed standby counsel. *Id*. Outside the jury's presence, the defendants vehemently objected to the order and vented their anger and frustration at the judge. The trial court found the defendants in contempt and declared a mistrial. *Id*.

¶ 34 The appeals court found that the trial court failed to confer with either standby counsel or the prosecutor before declaring a mistrial, nor did it consider alternatives to a mistrial. *Id*. at 229-

30. The actions of the trial court showed "anything but deliberation and concern for the defendants' protected interest in completing the trial." *Id*. at 229. Instead, the "rapid sequence of events *** reflect[ed] a spontaneous decision that could hardly be the result of scrupulously sound discretion." *Id*. at 230. The appeals court therefore gave no deference to the trial court's judgment to declare a mistrial "where the circumstances make that judgment so manifestly suspect." *Id*. See also *People v. Street*, 316 Ill. App. 3d 205, 213 (2000) (finding that the trial court abused its discretion in declaring a mistrial where the court failed to consider the State's suggestion of a curative instruction or any other alternative, and did not give the parties sufficient time to prepare responses to a possible mistrial); *People v. Dahlberg*, 355 Ill. App. 3d 308, 316 (2005) (finding that the trial court abused its discretion where it "acted hastily in response to the State's request for a mistrial, failed to consider any alternatives before declaring a mistrial, and took little time for reflection").

¶ 35    In this case, the trial court first raised the possibility of a mistrial after defense counsel incorrectly stated that he had requested a continuance to view the video recordings prior to trial. Counsel and the court argued over this issue and the record shows that the court became understandably frustrated with counsel's repeated assertions that he had asked for a continuance. The trial court then stated, "I don't recall you asking for a continuance. What I'm going to do is I'm going to *sua sponte* grant a mistrial in this case. We'll hold the matter until next week so that both parties can go ahead and get this evidence." When defense counsel tried to object, the trial court did not allow him to complete his argument. The court did not ask the State for a response.

¶ 36    The trial court explained that "[t]he State is objecting to this [instruction]. *** I want whatever jury is going to hear this case to be able to have the benefit of any evidence that is out there. *** The fact of the matter is you're telling me that there's something out there. You didn't ask for a continuance. I don't believe – I can have June read back the record. I don't believe you

ever asked for a continuance. Because in all likelihood, I would have granted a continuance. If there was evidence you didn't have, in all likelihood I would have granted you a continuance. I don't believe you asked for a continuance."

¶ 37    Like *Brady*, the trial court's decision to declare a mistrial was made quickly, without consultation of the parties, and without consideration of the alternatives to a mistrial other than limiting instructions. There is no indication in the record that the trial court carefully considered defendant's interest in having the trial conclude before a particular tribunal. Rather, it appears that the trial court *sua sponte* declared a mistrial because of its frustration over defense counsel's failure to request a continuance prior to trial. The trial court never considered whether a short recess could have sufficiently protected defendant's interest, although it acknowledged that the evidence was readily available to both parties. In fact, the record indicates that the parties actually viewed the footage shortly after the court declared a mistrial. Mistrial is a severe sanction that must be used with great caution in urgent circumstances, and for plain and obvious causes. *People v. Pondexter*, 214 Ill. App. 3d 79, 86 (1991). We find that the trial court did not exercise sound discretion in declaring the mistrial.

¶ 38    The State, however, argues that the trial court properly declared a mistrial. The court had found that defendant would have received ineffective assistance from defense counsel, where counsel failed to investigate possible video evidence and made no attempt to obtain the evidence when its existence became known to him. Instead of requesting a continuance, counsel elected to proceed to trial with only the possibility of giving limiting instructions to the jury. The State argues that the trial court's order protected defendant's interest in having the trial proceed with evidence potentially favorable to him.

¶ 39     Where obvious trial error occurs "that would make reversal on appeal a certainty," the trial court properly exercises its discretion to declare a mistrial because it would not serve the judicial process to require the State to proceed with its proof. *Illinois v. Somerville*, 410 U.S. 458, 464, 93 S. Ct. 1066, 1070, 35 L. Ed. 2d 425 (1973). Here, the trial court declared a mistrial, in part, because it believed that by proceeding with the trial, defendant would have a clear claim of ineffective assistance of counsel. An ineffective assistance of counsel claim has two prongs. First, defendant must show that counsel's performance was deficient. Second, he must show that he was prejudiced by counsel's deficient performance. *People v. Richardson*, 189 Ill. 2d 401, 411 (2000). Both prongs must be satisfied to prevail on the claim. *Id*.

¶ 40     The trial court premised its decision on defense counsel's failure to seek a continuance to obtain the video footage. Counsel's failure to request a continuance in order to obtain material evidence can be considered deficient performance. See *People v. Clamuextle*, 255 Ill. App. 3d 504, 510 (1994) (finding that defense counsel's failure to seek a continuance in order to locate a material witness was not trial strategy but instead constituted an "objectively unreasonable error").

¶ 41     However, to establish prejudice, one must show there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Richardson*, 189 Ill. 2d at 411. "[D]efendant must show that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair." *Id*. The trial court below found that defendant "would have been prejudiced by proceeding to trial without knowing what was on those tapes" because the trial would have been completed "without critical evidence."

¶ 42     However, at the time the mistrial was declared, neither the court nor the parties knew what was depicted on the video recordings. A finding that the video would affect the outcome of the

trial would have been based on pure speculation. To establish prejudice, a defendant cannot rely on speculation or conjecture but must prove that the outcome of the proceeding would have been different. *People v. Holman*, 164 Ill. 2d 356, 369 (1995). Without a showing that defendant would have been prejudiced by counsel's deficient performance, counsel's failure to investigate or obtain the video recordings could not constitute reversible error.

¶ 43    We also find that defense counsel's failure to request a continuance, the other basis for the trial court's finding that counsel was ineffective, was not necessarily reversible error. Prior to trial, defense counsel indicated that he knew a potential recording existed, yet he did not request a continuance to view the video. "His failure to do so [could be taken as] persuasive evidence that the prejudice here alleged was in fact trivial." *People v. Foster*, 76 Ill. 2d 365, 384 (1979).

¶ 44    Moreover, without knowledge of what the video actually depicted, the trial court could not determine whether the lack of a continuance " 'in some manner embarrassed the accused in the preparation of his defense and thereby prejudiced his rights.' " *People v. Walker*, 232 Ill. 2d 113, 125 (2009), quoting *People v. Lewis*, 165 Ill. 2d 305, 327 (1995). Even if we presume that the recording captured the alleged incident, defendant never denied that he was at the Metra station that day or that he ran away from a group of people. Existence of the video recording most likely would not have affected defendant's strategy at trial.

¶ 45    Since the trial court had not thoroughly considered the prejudice to defendant from counsel's deficient performance, we cannot conclude that counsel's alleged ineffective assistance would have constituted reversible error supporting a mistrial.

¶ 46    We recognize that the trial court was frustrated with defense counsel's insistence that the court had denied his request for a continuance prior to trial. However, even when the problem is one of counsel error, "the trial judge must still take care to assure himself that the situation warrants

action on his part foreclosing the defendant from a potentially favorable judgment by the tribunal." *Jorn*, 400 U.S. at 485, 91 S.Ct. at 557, 27 L.Ed.2d 543. In this case, the trial court's decision was made relatively quickly without input from the parties. There was no indication at the time that an obvious and reversible trial error occurred. We find that a manifest necessity for the mistrial was not shown, and the trial court abused its discretion in declaring a mistrial. Accordingly, we reverse the court's denial of defendant's motion to dismiss on double jeopardy grounds.

¶ 47                                  III. CONCLUSION

¶ 48    For the foregoing reasons, the judgment of the circuit court is reversed.

¶ 49    Reversed.